**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

───────────────────────────────

**PASTOR PAUL DOYLE,**
**CLAY CLARK,**

                              **Plaintiffs,**

**v.**

                                                                    **23-CV-00071-JLS-HKS**

**ATTORNEY GENERAL LETITIA JAMES,**
**In her individual and official capacity,**

                              **Defendant.**

───────────────────────────────

## REPORT, RECOMMENDATION & ORDER

        This case was referred to the undersigned by the Hon. John L. Sinatra, Jr., pursuant to 28 U.S.C. § 636(b)(1), for all pretrial matters and to hear and report upon dispositive motions. Dkt. #14.

        This is a civil rights action arising out of a letter sent by defendant to plaintiffs on August 3, 2022 regarding a planned event at Cornerstone Church in Batavia, New York hosted by "ReAwaken America," a conservative political movement.

        Currently before the Court is defendant's motion to dismiss plaintiffs' complaint. Dkt. #13.

## BACKGROUND

Plaintiff Paul Doyle ("Doyle") is the Senior Pastor at Cornerstone Church in Batavia, New York. Dkt. #1, ¶ 6. Cornerstone is a small, rural church with a history of service and community outreach. Dkt. #1, ¶ 7. Cornerstone has worked to build relationships with communities of color and was aggressive in their assistance to victims of the mass shooting in Buffalo. *Id.*

Plaintiff Clay Clark ("Clark") is the owner and operator of The Thrive Time Show, a highly successful business podcast. Dkt. #1, ¶ 8. Clark has twice been named the US Small Business Association Entrepreneur of the Year and is the recipient of other business awards. *Id.*

"ReAwaken America" is a conservative political movement that hosts events throughout the country. Dkt. #1, ¶ 9. The ReAwaken America Tour ("the Tour") was scheduled to host an event in Rochester, New York on August 12, 2022 at the Main Street Armory. Dkt. #1, ¶ 17. However, after community members and local politicians spoke out against the event, the Armory cancelled it. Dkt. #1, ¶¶ 17-18.

The Tour then reached out to Doyle to see if Cornerstone would be willing to host the event. Dkt. #1, ¶ 18. Doyle met with groups from Rochester to try to understand their concerns and concluded that "the Tour was not what was being portrayed in the media and by government officials." Dkt. #1, ¶ 19. Doyle thus agreed to host the event at Cornerstone "due to his strong belief that free speech should not be restricted and those

who attempt to exercise it should not be intimidated, particularly by government officials." Dkt. #1, ¶ 18. The event was scheduled for August 11-13, 2022. Dkt. #1, ¶ 9.

On August 3, 2022, New York Attorney General Letitia James sent a letter addressed to Clark and General Michael Flynn—a co-organizer of the Tour—to Doyle's home address "c/o Cornerstone Church." Dkt. #1, ¶ 10. Plaintiffs allege that the letter was "nothing less than an attempt to covertly intimidate and threaten the Plaintiffs into shutting down the event." Dkt. #1, ¶ 11.

James's letter stated, in part:

As New York's top law enforcement officer, I have significant concerns that the ReAwaken America Tour's upcoming event at the Cornerstone Church in Batavia, New York on August 12 and 13 could spur extremist or racially motivated violence. These concerns center around the event's proposed dates, which coincide with the five-year anniversary of the deadly Unite the Right rally in Charlottesville, Virginia, and past extremist statements made by yourselves and the other featured speakers on the tour.

I am especially concerned about featured speakers' regular allusions to white nationalist ideals connected to the "Great Replacement Theory," a conspiracy theory that warns of white genocide and efforts to replace native born Americans with immigrants. The theory is frequently linked to violent actions, including the racially motivated mass shooting that killed 10 people at a Tops Friendly Markets store in Buffalo. Especially in light of this racist mass shooting, and other recent episodes of racially motivated violence in New York and throughout the country, the Office of the Attorney General is concerned that such rhetoric could contribute to violent or unlawful conduct at the ReAwaken America Tour's upcoming event.

Dkt. #1, p. 21.

The letter continued:

The Office of the Attorney General writes to remind you that New York law prohibits racially motivated violence, harassment, or interference with another person in the exercise of their civil rights. New York Civil Rights Law § 79-n empowers the Office of the Attorney General to investigate acts of violence, intimidation, threats, or harassment directed at people based on a belief or perception regarding an individual's race, color, national origin, ancestry, gender, religion, religious practice, age, disability, or sexual orientation. In addition to actual damages, any person who violates this statute can be held liable for $5,000 in penalties for each violation.

Additionally, New York Civil Rights Law § 40-c prohibits discriminating against another person in the exercise of their civil rights—including their right to peacefully protest—based on similar protected characteristics. Finally, New York Executive Law § 63(12) empowers the Office of the Attorney General to take action against any business engaged in significant fraud or illegality—including the violation of New York's civil rights laws.

The Office of the Attorney General has a duty to protect New Yorkers from extremist and racially motivated violence. We stand ready to investigate any violation of the laws above and, if necessary, to enforce them to the fullest extent available. You are therefore instructed to take all necessary steps to ensure that the event complies fully with the requirements of New York's civil rights laws and all other applicable state and federal statutes.

Your cooperation in ensuring a peaceful and law-abiding event will be greatly appreciated.

Dkt. #1, pp. 21-22.

Plaintiffs allege that James's "inferences towards racial discrimination and fraud associated with the church and the event were publicized in numerous media outlets . . . which injured Pastor Doyle's reputation, that of his church, and the reputation of Mr. Clark as well." Dkt. #1, ¶ 13. They further allege that James made no reasonable inquiry to verify her alleged concerns and that, had she done so, she would have learned "about the generous history of Cornerstone Church, the upstanding reputation of both Plaintiffs, and the fact that the Reawaken America Tour had not a single publicized act of violence at any of their events, nor has the tour been legitimately accused of any crimes, illicit behavior, or the violation of any laws or ordinances." Dkt. #1, ¶ 15. Plaintiffs also allege that they had "reached out to law enforcement and local government officials to ensure the safety of the event and that all local rules, laws, and ordinances would be followed." Dkt. #1, ¶ 19.

Plaintiffs further allege that no ReAwaken America event has ever been associated with the racial theories or violence with which James's letter purported to connect them, and her statements were "negligent, reckless and a dereliction of her duty to exercise due diligence in her representation as Attorney General and in doing so, is an abuse of power." Dkt. #1, ¶¶ 25, 33.

Plaintiffs allege that James's politically motivated letter created a "smear" on their names and damaged their community relationships. Dkt. #1, ¶ 14. The publicity surrounding James's letter resulted in "numerous cancellations of ticket sales by patrons

who originally planned to attend the event prior to hearing the derisive false reports." Dkt. #1, ¶ ¶ 43-44.

Finally, plaintiffs allege that, as a result, they were forced to hire additional security to ensure the safety of the participants and attendees. Dkt. #1, ¶ 40. Ultimately, the event "went off without a single issue." Dkt. #1, ¶ 16.

Plaintiffs filed this action on January 20, 2023, alleging: (1) First Amendment retaliation and violation of the right to free association pursuant to 42 U.S.C. § 1983; (2) defamation/libel per se; (3) violation of N.Y. Civil Rights Law § 40-c; and (4) negligence. Dkt. #1, ¶¶ 47-86.

## DISCUSSION AND ANALYSIS

## First Amendment Retaliation—Rule 12(b)(1)

Defendant first moves for dismissal under Fed. R. 12(b)(1) on the grounds that plaintiffs lack standing to bring their First Amendment retaliation claims. Dkt. #13-1, pp. 13-20.

### *General Principles*

The "irreducible constitutional minimum of standing" contains three elements:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical . . . . Second,

there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly . . .trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court . . . . Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 55 (2d Cir. 2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

"'Although standing is a fundamental jurisdictional requirement, it is still subject to the same degree of proof that governs other contested factual issues.'" *Pearl v. DCM Servs., LLC*, 2:21-cv-05320-OEM, 2023 WL 5843721, at *2 (E.D.N.Y. Sept. 10, 2023) (quoting *Baur v. Veneman*, 352 F.3d 625, 631 (2d Cir. 2003)). "Thus, at the pleading stage, standing allegations need not be crafted with precise detail, nor must the plaintiff prove his allegations of injury." *Id.* A complaint "merely must allege facts that affirmatively and plausibly suggest that [plaintiff] has standing to sue." *Id.* (citation and internal quotation marks omitted).

Further, on a Rule 12(b)(1) motion directed at standing, a court "must accept as true all material factual allegations in the complaint, but must not draw inferences favorable to the party asserting jurisdiction." *Levy v. Endeavor Air Inc.*, 638 F. Supp.3d 324, 327 (E.D.N.Y. 2022) (citation and internal quotation marks omitted). "Additionally, in resolving a motion challenging subject matter jurisdiction, 'a district court may consider evidence outside the pleadings.'" *Id.* (quoting *Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008)).

***Concrete and Actual Injury in Fact***

Defendant argues that plaintiffs' alleged injuries are insufficient to confer standing. Dkt. #13-1, pp. 16-20. Defendant is mistaken.

"Chilled speech is not the *sine qua non* of a First Amendment claim." *Dorsett v. Cnty. of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013). Rather, a "plaintiff has standing if he can show *either* that his speech has been adversely affected by the government retaliation or that he has suffered *some other concrete harm*." *Id.* (second emphasis added). "Various non-speech related harms are sufficient to give a plaintiff standing." *Id.* (citations omitted). *See also Zherka v. Amicone*, 634 F.3d 642, 646 (2d Cir. 2011) ("Where chilling is not alleged, other forms of tangible harm will satisfy the injury requirement, since standing is no issue whenever the plaintiff has clearly alleged a *concrete* harm independent of First Amendment chilling.") (citation and internal quotation marks omitted).

In *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021), the Supreme Court considered Article III's standing requirement as it related to certain statutory claims. The Court observed that, in addition to traditional tangible harms, "[v]arious intangible harms can also be concrete" for Article III purposes. *Id.* at 425. "Chief among them are injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts." *Id.* (citation omitted). The Court named, as the first example, "reputational harms." *Id.* (citations omitted).

The Court then held that alleged reputational harm was sufficiently concrete to confer standing on class members whose credit reports—which contained inaccurate information flagging them as potential terrorists or serious criminals—were disseminated to third-party businesses. *Id.* at 432-33. The Court reasoned that plaintiffs' alleged reputational harm bore a "close relationship" to "a harm traditionally recognized as providing a basis for a lawsuit in American courts—namely, the reputational harm associated with the tort of defamation." *Id.* at 432.

Here, plaintiffs' complaint is replete with allegations that defendant's letter falsely associated them with racist, "white nationalist ideals;" the "Great Replacement Theory;" a racially motivated shooting in Buffalo, New York; and other "racially motivated violence." Dkt. #1, ¶¶ 13, 21, 27, 42, 64, 68. Plaintiffs allege specific damages flowing from defendant's statements: injury to plaintiffs' reputations; harm to Doyle's community relationships, and specifically with communities of color; and an increased likelihood of violence towards plaintiffs. Dkt. #1, ¶¶ 13, 14, 39, 43, 53, 64.

Under *TransUnion*, plaintiffs thus have alleged concrete reputational harms sufficient to confer Article III standing. *See also Wang v. Bethlehem Cent. Sch. Dist.*, 1:21-CV-1023 (LEK/DJS), 2022 WL 3154142, at *5 (N.D.N.Y. Aug. 8, 2022) (applying *TransUnion* and holding that high school student who was barred from speaking at graduation ceremony had standing where he alleged that superintendent's actions led his

peers to believe he had engaged in misconduct, causing "continued vilification and stigmatization" against him).[1]

It will thus be recommended that defendant's motion to dismiss pursuant to Rule 12(b)(1) be denied.

## First Amendment Retaliation—Rule 12(b)(6)[2]

### *Pleading Sufficiency*

Defendant argues in the alternative that plaintiffs' First Amendment claim fails to state a cause of action. Dkt. #13-1, pp. 21-31.

---

[1] Defendant also argues that Doyle lacks standing because he was not mentioned by name in defendant's letter. Dkt. #13-1, pp. 15-16. This argument elevates form over substance. First, defendant concedes that the letter was sent "c/o Cornerstone Church" and was mailed to Doyle's home address. Dkt. #13-1, p. 12. And, although Doyle's name does not appear in the letter, plaintiffs allege that he is the Senior Pastor of the church, which is in a small, rural community, and that the Church's name is synonymous with his name. Doyle also alleges specific damage to his reputation and community relationships arising from defendant's letter. For pleading purposes, Doyle has thus alleged an identity of interest between himself and Cornerstone Church for purposes of Article III's concrete-harm requirement. The cases cited by defendant for the contrary conclusion are not applicable. *Kropelnicki v. Siegel*, 290 F.3d 118,130 (2d Cir. 2002) (mother lacked standing to assert Fair Debt Collection Practices Act claim by virtue of her opening and reading a letter addressed to her daughter); *Ass'n of Am. Physicians and Surgeons*, 518 F. Supp.3d 505, 516 (D.D.C. 2021) (social media user lacked standing to assert claims based on government's alleged coercion of third parties).

[2] On a Rule 12(b)(6) motion, the Court may consider plaintiffs' complaint and the letter attached thereto. *See O'Connell-Byrne v. Hilton Cent. Sch. Dist.*, 6:23-CV-06308-EAW, 2024 Wl 655601, at *3 (W.D.N.Y. Feb. 16, 2024) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint.") (citation and internal quotation marks omitted).

"[T]o survive a Rule 12(b)(6) motion, the complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Levy v. Endeavor Air Inc.*, 638 F. Supp.3d 324, 327-28 (E.D.N.Y. 2022) (citations and internal quotation marks omitted). This "plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* The court "must accept as true all [factual statements alleged] in the complaint and draw all reasonable inferences in favor of the nonmoving party." *Id.*

"To plead a First Amendment retaliation claim a plaintiff must show: (1) he has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by his exercise of that right; and (3) the defendant's actions caused him some injury." *Dorsett v. Cnty. of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013) (citation and internal quotation marks omitted).

Defendant does not contest that plaintiffs have adequately pleaded the first element of this claim, *i.e.*, that their gathering and speech at the ReAwaken America Tour were protected by the First Amendment.

However, defendant challenges the second element, arguing that the Court should reject plaintiffs' "conclusions" regarding defendant's intent in sending plaintiffs the letter regarding the Tour. Dkt. #13-1. But this turns Rule 12(b)(6) on its head. *See Karol v. City of New York*, 396 F. Supp.3d 309, 313 (S.D.N.Y. 2019) ("The Court's function on a motion to dismiss is not to weigh the evidence that might be presented at trial but merely

to determine whether the complaint itself is legally sufficient.") (citation and internal quotation marks omitted).

Plaintiffs' complaint alleges facts, not mere legal conclusions, regarding defendant's motivations in sending the letter:

- Defendant "saw the Reawaken America tour filled with her political rivals and wanted them out of the state. She then leveraged her power, authority, and official title as Attorney General of the State of New York to defame, slander, and threaten fully law-abiding citizens, a church, and its congregants who were simply and peacefully, exercising their constitutional and civil rights;

- "Pastor Doyle and Mr. Clark have a civil right to assemble and speak, so do the attendees and participants at the ReAwaken America event. Ms. James leveraging her authority and New York law to intimidate the Plaintiffs' free speech, and right to assemble, without any rationale *other than political hatred*, was the only law that was violated here;

- DEFENDANT James' letter to Plaintiffs also had the intent of creating community vitriol towards the PLAINTIFFS, which certainly increased the likelihood of violence [ ] against *the Plaintiffs and their organizations*;

- The "motivating factors for [defendant's] contemptuous letter were the political and religious viewpoints of the Plaintiffs coupled with their race and color;

- "The Plaintiffs here have a clear First Amendment Right to assemble and speak. When they attempted to exercise that right, the Defendant drafted and sent them a politically driven letter specifically designed to chill their speech;" and

-  "The letter sent by the Defendant was meant to intimidate and harass the Plaintiffs into not exercising these rights through government coercion and veiled threats of investigation and prosecution into Pastor Paul and Cornerstone Church, Clay Clark, and the ReAwaken America Tour."

Dkt. #1, ¶¶ 16, 30, 39, 50, 53, 54.

"The Second Circuit Court of Appeals has recognized that the questions of a defendant's motive and intent, though critical to First Amendment retaliation claims, are difficult to plead with specificity in a complaint." *Karol*, 396 F. Supp.3d at 317 (citation and internal quotation marks omitted). It is thus sufficient for a plaintiff "to allege facts from which a retaliatory intent on the part of the defendants reasonably may be inferred." *Id.* Plaintiffs' complaint satisfies this requirement.

As to the third element, because plaintiffs have alleged "a concrete harm sufficient for Article III standing, it is also sufficient to meet *Dorsett*'s requirement of 'some injury.'" *Doe v. City of New York*, 18-cv-670 (ARR) (JO), 2018 WL 3824133, at *14 (E.D.N.Y. Aug. 9, 2018).

Defendant also argues that plaintiffs' First Amendment claim is deficient because the complaint contains "unspecified allegations about media statements lacking any specificity." Dkt. #13-1, p. 23. But the only contemporary case defendant cites concerns a common law claim for libel in the context of summary judgment, not a First Amendment retaliation claim at the pleading stage. *Hawkins v. City of New York*, 99 Civ. 11704 (RWS), 2005 WL 1861855, at *1, 18 (S.D.N.Y. Aug. 4, 2005).

The Court thus concludes that plaintiffs have adequately pleaded a First Amendment retaliation claim.

### *Government Speech*

Defendant next argues that plaintiffs' First Amendment claims fail because defendant's letter to plaintiffs was protected government speech. Dkt. #13-1, pp. 24-30.

"Under the government speech doctrine, public officials are generally free to favor certain views over others when they speak." *Nat'l Rifle Ass'n of Am. v. Vullo*, 49 F. 4th 700, 715 (2d Cir. 2022) (citation omitted), *cert. granted*, 144 S. Ct. 375 (Nov. 3, 2023) (No. 22-842).[3] "A viewpoint-neutrality requirement is antithetical to a healthy representative democracy, and when a government official embarks on a course of action, she may well embrace one viewpoint and reject others." *Id.* (citation omitted).

"Nevertheless, in certain circumstances, some government speech may infringe on private individuals' free speech rights." *Id.* (citations omitted). "Government officials may not engage in unjustified threats or coercion to stifle speech." *Id.* "Accordingly, although government officials are free to advocate for (or against) certain viewpoints, they may not encourage suppression of protected speech in a manner that can reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request." *Id.* (citation and internal quotations omitted).

---

[3] The United States Supreme Court heard oral arguments in *Vullo* on Monday, March 18, 2024. *See* Supreme Court of the United States, https://www.supremecourt.gov/oral_arguments/argument_transcript/2023 (last visited Mar. 20, 2024). The Court notes that, although the Justices' questions during those arguments suggest that the Supreme Court may reverse *Vullo*, neither a reversal nor an affirmance would alter the recommendation contained herein.

The constitutionality of government speech turns on "the distinction between attempts to convince and attempts to coerce." *Id.* Courts consider several factors regarding this distinction: (1) word choice and tone; (2) the existence of regulatory authority; (3) whether the speech was perceived as a threat; and, "perhaps most importantly, (4) whether the speech refers to adverse consequences." *Id.*

"Under certain circumstances, oral or written statements made by public officials will require courts to draw fine lines between permissible expressions of personal opinion and implied threats to employ coercive state power to stifle protected speech." *Id.* (citation and internal quotations omitted).

### Word Choice and Tone

Examination of defendant's letter—not plaintiffs' characterization of it, *Vullo,* 49 F.4th at 716—shows that it is not protected government speech. Indeed, all four factors above support this conclusion.

First, the tone of defendant's letter is not one of attempted persuasion or advocacy for a particular viewpoint, *i.e.*, an "attempt[ ] to convince." *Vullo*, 49 F.4th at 715. Rather, the letter—written on official letterhead—opens with defendant's invocation of her title as "New York's top law enforcement officer" and then expresses "concerns" to plaintiffs, including "past extremist statements made ***by yourselves*** and the other featured speakers on the tour." Dkt. #1, p. 21 (emphasis added).

Defendant then references racially discriminatory theories and a racially motivated mass shooting, after which she states that "the Office of the Attorney General is concerned that such rhetoric could contribute to **violent or unlawful conduct**" at the ReAwaken America event at Cornerstone. *Id.* (emphasis added).

Defendant further states that she "writes to remind" plaintiffs of New York laws that prohibit racially motivated violence or interference with civil rights, mentioning her office's power to "investigate," "damages," "penalties," and her power to "take action against any business engaged in significant fraud or illegality." Dkt. #1, pp. 21-22. Finally, defendant states: ***"We stand ready to investigate any violation of the laws above and, if necessary, to enforce them to the fullest extent available."*** (emphasis added). Dkt. #1, p. 22.

These statements stand in contrast to speech found by courts to constitute political advocacy or personal views. In *Vullo*, for example, the Second Circuit held that communications from a New York official to banks and insurance companies encouraging them to reconsider dealing with the National Rifle Association ("NRA") were not threatening or coercive because the official was generally advocating for gun control, and she spoke "in an even-handed, nonthreatening tone and employed words intended to persuade rather than intimidate." *Vullo*, 49 F.4th at 717.

Similarly, in *Hammerhead Enters., Inc. v. Brezenoff*, 707 F.2d 33 (2d Cir. 1983), the Second Circuit held that a letter sent by a city official to retailers urging them

not to carry a controversial board game "was nothing more than a well-reasoned and sincere entreaty in support of his own political perspective." *Id.* at 38.

Here, defendant's letter has a heavy-handed, ominous tone and tells plaintiffs that: (1) she considers their own past statements concerning and "extremist," (2) she believes that "such rhetoric" could lead to "violent or unlawful conduct" at the upcoming event; and (3) she "stands ready" to investigate and enforce violations of New York laws, whose penalties she enumerates. Dkt. #1, pp. 21-22. This is neither "even-handed" nor a mere "entreaty."

Defendant relies on *X-Men Sec., Inc. v. Pataki*, 196 F.3d 56 (2d Cir. 1999), to argue that her letter was "far more restrained" than the speech in that case. However, the court found that the speech in question constituted legislators' personal views of plaintiffs and the Nation of Islam; that their speech was advocacy; and that it contained no "semblance of threat, coercion, or intimidation." *Id.* at 68, 70-71. The same cannot be said of defendant's letter.

Lastly, defendant attempts to cast her letter in a softer light by noting that it closed: "Your cooperation in ensuring a peaceful and law-abiding event will be greatly appreciated." Dkt. #13-1, pp. 27-28. Such niceties, however, cannot unring the bell of constitutionally suspect speech. *See Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, (1963) (holding unconstitutional state's notices to publishers regarding allegedly obscene

publications; notices typically thanked publisher in advance for his "cooperation" with state commission).

### Regulatory Authority

As to the second factor, defendant does not dispute that she had the authority to bring legal action against plaintiffs—she made that very clear in her letter. *See Okwedy v. Molinari*, 333 F.3d 339, 343 (2d Cir. 2003) (noting that "the existence of regulatory or other direct decisionmaking authority is certainly relevant to the question of whether a government official's comments were unconstitutionally threatening or coercive").

### Whether the Letter Was Perceived as a Threat

Defendant next argues that her letter "was not and could not reasonably have been perceived as a threat." Dkt. #13-1, pp. 28-29. This is belied by the record.

Plaintiffs' complaint clearly alleges that they perceived defendant's letter as a threat intended to cause them to cancel the ReAwaken America event and/or a threat to prosecute them if they proceeded. Dkt. #1, ¶¶ 11-13, 16, 20, 26, 30, 36, 41-42, 51-56. Defendant's argument that these allegations should not be credited runs afoul of Rule 12(b)(6). *See Levy v. Endeavor Air Inc.*, 638 F. Supp.3d 324, 327-28 (E.D.N.Y. 2022) (when considering a Rule 12(b)(6) motion, a court "must accept as true all [factual statements alleged] in the complaint and draw all reasonable inferences in favor of the nonmoving party.") (citations and internal quotation marks omitted).

***Whether the Speech Refers to Adverse Consequences***

As to the fourth factor, defendant argues that her letter did not threaten prosecution but merely contained a "general statement of the law." Dkt. #13-1 pp. 29-30. This argument is not well taken.

As set forth above, the sequence of the points in defendant's letter and its tone could reasonably cause its recipients to believe that defendant was raising the specter of prosecution should they proceed with the event. This is particularly true given that she opened by invoking her title as "New York's top law enforcement officer" and referenced what she described as "past extremist statements" by plaintiffs and other speakers on the Tour. Dkt. #1, p. 21.

As noted, the Second Circuit has described this fourth factor as perhaps the most important in determining whether a state actor's speech crosses the constitutional line between persuasion and coercion. *Vullo*, 49 F.4th at 715. In finding no constitutional violation in *Vullo*, the court emphasized that defendant's statements did not intimate punishment or adverse regulatory action if the recipients rebuffed her suggestion that they sever contacts with the NRA. *Id.* at 717. *See also Zieper v. Metzinger*, 474 F.3d 60, 67 (2d Cir. 2007) (plaintiff could have reasonably interpreted defendants' statements and actions as suggesting that "there might be legal consequences if he failed to accede to

the government's request that he remove his video"); *Okwedy*, 333 F.3d at 344 (letter to billboard company from city borough president was unconstitutional because, *inter alia*, it "contained an implicit threat of retaliation"); *Rattner v. Netburn*, 930 F.2d 204, 209-10 (2d Cir. 1991) (village trustee's letter contained "veiled" threat of reprisal); *Hammerhead*, 707 F.2d at 39 ("Where comments of a government official can reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request, a valid claim can be stated.").

"It would thus be naïve to credit the State's assertion that these [communications] are in the nature of mere legal advice." *Bantam Books v. Sullivan*, 372 U.S. 58, 68 (1963).[4]

The Court thus concludes that defendant's letter does not constitute protected government speech.[5]

---

[4] Defendant cites *VDARE Found. v. City of Colorado Springs*, 11 F.4th 1151 (10th Cir. 2021), in support of her arguments, but that case is distinguishable. The challenged speech there was a public statement by the mayor, in the wake of the Charlottesville, Virginia rally violence, that: "The City of Colorado Springs does not have the authority to restrict freedom of speech, nor to direct private businesses like the Cheyenne Mountain Resort as to which events they may host. That said, I would encourage local businesses to be attentive to the types of events they accept and the groups that they invite to our great city." *Id.* at 1157. The court concluded that this statement, which was not directed at the plaintiff, did not constitute a threat. *Id.* at 1171-72. The speech in *VDARE* was qualitatively more benign than the defendant's letter in this case, and the case does not change this Court's conclusion.

[5] Defendant also argues in her motion, and the Court agrees, that it is unclear if plaintiffs are attempting to state a separate freedom of association claim. Dkt. #13-1, p. 30. Plaintiffs do not clarify this ambiguity in their response to defendant's motion; in fact, they do not mention a freedom of association claim at all. The Court thus infers that plaintiffs are not pursuing such a cause of action.

### *Sovereign Immunity*

Defendant argues that plaintiffs' First Amendment claim against her for damages in her official capacity is barred by sovereign immunity. Dkt. #13-1, p. 21. She is correct. *See Mauro v. Cuomo*, 21-CV-1165, 2023 WL 2403482, at *2 (E.D.N.Y. Mar. 8, 2023) ("'The Eleventh Amendment confirms that states, state entities, and state officials acting in their official capacities have sovereign immunity from suit.'") (quoting *Kelly v. N.Y. State Unified Ct. Sys.*, No. 21-cv-1633, 2022 WL 1210665, at *1 (2d Cir. Apr. 25, 2022)).

There is an exception to such immunity where the plaintiff seeks injunctive relief, but such relief must be prospective. *Id.* at *3 ("The *Ex Parte Young* doctrine applies where a plaintiff alleges an ongoing violation of federal law, but courts have declined to extend relief to claims for retrospective relief.") (citation omitted).

Here, plaintiffs do not allege an ongoing violation of federal law, and their request for a retraction of defendant's letter "merely seeks to remedy past wrongs and their continuing *effects*." *Stollings v. Texas Tech Univ.*, No. 5:20-CV-250-H, 2022 WL 82482, at *9 (N.D. Tex. Mar. 18, 2022) (holding that plaintiff's request for order requiring defendant to retract letter that allegedly violated her Equal Protection rights failed to meet the *Ex Parte Young* exception for prospective relief).

The Court thus concludes that plaintiffs' First Amendment claims against defendant in her official capacity are barred by sovereign immunity.

### Qualified Immunity

Defendant next argues that, even if plaintiffs have pleaded a viable First Amendment retaliation claim against her in her individual capacity, she is entitled to qualified immunity. Dkt. #13-1, pp. 32-35.

"Qualified immunity shields government officials performing discretionary functions from suits for money damages unless their conduct violates clearly established law of which a reasonable official would have known." *Nat'l Rifle Ass'n of Am. v. Vullo*, 49 F. 4th 700, 714 (2d Cir. 2022) (citation omitted), *cert. granted*, 144 S. Ct. 375 (Nov. 3, 2023) (No. 22-842). "It gives government officials the breathing room to make reasonable, even if mistaken, judgments and protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (citation and internal quotations omitted). It applies unless (1) the plaintiff sufficiently pleaded a constitutional violation and (2) the law the official allegedly violated was clearly established and apparent to a reasonable official at the time of the alleged conduct. *Id.* (citations omitted).

"To be sure, qualified immunity should be resolved "at the earliest possible stage in litigation." *Chamberlain Est. of Chamberlain v. City of White* Plains, 960 F.3d 100, 110 (2d Cir. 2021) (citation and internal quotation marks omitted). "But there is an obvious, if rarely expressed, corollary to that principle: The immunity question cannot be

resolved *before* the "earliest possible stage," i.e., prior to ascertainment of the truth of the plausible factual allegations on which a finding of qualified immunity is premised." *Id.* "And since qualified immunity is an affirmative defense that is typically asserted in an answer, . . . as a general rule, "the defense of qualified immunity cannot support the grant of a [Rule] 12(b)(6) motion." *Id.*

In *McKenna v. Wright*, 386 F.3d 432 (2d Cir. 2004), the Second Circuit explained that where a defendant raises the qualified immunity defense at the pleading stage, the facts on which the defense is based must appear on the face of the complaint, and "the plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense." *Id.* at 436 (citations omitted).

"Thus, a qualified immunity defense presented on a Rule 12(b)(6) motion faces a formidable hurdle . . . and is usually not successful." *Chamberlain*, 960 F.3d at 111 (citation and internal quotation marks omitted). "Put another way, advancing qualified immunity as grounds for a motion to dismiss is almost always a procedural mismatch." *Id.*

Construing plaintiffs' allegations as true, granting qualified immunity at this juncture is not appropriate.

First, it has long been clearly established that "implied threats to employ coercive state power to stifle protected speech" violate the First Amendment.

*Hammerhead Enters., Inc. v. Brezenoff*, 707 F.2d 33, 39 (2d Cir. 1983). Defendant does not argue otherwise.

Second, as the above discussion illustrates, the Second Circuit had clearly delineated, prior to August 3, 2022, the distinction between "attempts to convince and attempts to coerce," *Okwedy v. Molinari*, 333 F.3d 339, 344 (2d Cir. 2003), such that the right to be free from such coercion was "clearly established" in a "more particularized" sense. *Vullo*, 49 F. 4th at 719.

Third, plaintiffs have plausibly alleged that defendant acted with an improper retaliatory motive in sending the letter. The Second Circuit has held that "it can never be objectively reasonable for a government official to act with the intent that is prohibited by law." *Locurto v. Safir*, 264 F.3d 154, 169 (2d Cir. 2001) (citation omitted). *See, e.g., Greco v. City of New York*, Case No. 22-CV-5109 (FB) (VMS), 2023 WL 5024720, at *7 (E.D.N.Y. Aug. 8, 2023) (denying motion to dismiss plaintiff's First Amendment retaliation claim on qualified immunity grounds because claim "turns on the subjective intent that NYPD officials had when they investigated and terminated him").

*Vullo* also does not support defendant's position. There, the Second Circuit held that existing caselaw did not clearly establish that defendant's statements were unconstitutionally threatening or coercive. *Id.* at 719. Specifically, the Court noted that defendant's communications used "only suggestive language" and relied "on the power

of persuasion," such that it would not have been clear that her speech was impermissibly coercive. *Id.* at 720.

Defendant's letter is qualitatively different from the statements in *Vullo*. And defendant's characterization of her letter as merely "voicing concerns," Dkt. #13-1, p. 33, ignores the letter's overall tone and substance. *See Zieper v. Metzinger*, 474 F.3d 60 (2d Cir. 2007) ("[I]t is necessary to consider the entirety of the defendants' words and actions in determining whether they could reasonably be interpreted as an implied threat.").

Defendant's reliance on *X-Men Sec., Inc. v. Pataki*, 196 F.3d 56 (2d Cir. 1999), is again misplaced. The Second Circuit reversed the district court's denial of qualified immunity, not on a finding of objective reasonableness, but rather on a finding that plaintiff failed to state a claim for a constitutional violation. *Id.* at 72. Here, the Court has concluded that plaintiffs have cleared that hurdle.

Finally, defendant cites *Zieper*, in which the court found that an FBI agent and assistant United States Attorney were entitled to qualified immunity on a First Amendment claim brought by a filmmaker they interviewed regarding a controversial video he made about a possible military takeover of New York City. The court held that it would not have been apparent to reasonable officers that their statements were unconstitutional because they fell "considerably short" of thinly veiled threats. *Id.* at 70. The court also reasoned that the defendants were "forced to act quickly" because of the public danger posed by imminent publicity of plaintiff's film. *Id.* at 71.

In contrast, defendant here was not responding to any immediate threat to the public. Instead, she drafted a letter—presumably with forethought—which may reasonably be construed as threatening citizens with prosecution should they exercise their First Amendment rights. Therefore, it cannot be said at the pleading stage that defendant could only have believed that her letter was objectively reasonable. *See O'Connell-Byrne v. Hilton Cent. Sch. Dist.*, 6:23-CV-06308 EAW, 2024 WL 655601, at \*9 (W.D.N.Y. Feb. 16, 2024) ("[Q]ualified immunity requires a finding of objective reasonableness, which would be inconsistent with the Court's finding that Plaintiff has plausibly alleged [a First Amendment] claim."); *Karol v. City of New York*, 396 F.Supp.3d 309, 320 (S.D.N.Y. 2019) ("The question whether it was objectively reasonable for the defendants to inspect the plaintiff's home and issue the four summonses cannot be resolved on this motion [to dismiss].").

It will thus be recommended that defendant's motion to dismiss on qualified immunity grounds be denied.

### State Law Claims[6]

Defendant first argues that plaintiffs' state law claims against her in her official capacity are barred by the Eleventh Amendment, regardless of the relief sought.

---

[6] Defendant's argument that the Court should decline to exercise its supplemental jurisdiction pursuant to 28 U.S.C. §1367(c), Dkt. #13-1, pp. 35-36, is not well taken given the Court's conclusion that plaintiffs have adequately alleged federal claims.

Dkt. #13-1, pp. 20-21. She is correct. *See Valde-Cruz v. Russo*, No. 20-CV-9240 (KMK), 2024 WL 809903, at *4-5 (S.D.N.Y. Feb. 27, 2024) (collecting cases).

### *Defamation*

Under New York law, defamation "is defined as the making of a false statement which tends to expose the plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of him in the minds of right-thinking persons, and to deprive him of their friendly intercourse in society." *Nunes v. NBCUniversal Media, LLC*, 643 F. Supp.3d 403, 412 (S.D.N.Y. 2022) (citation and internal quotation marks omitted).

The elements of a defamation claims are "a false statement, published without privilege or authorization to a third party, constituting fault as judged by, and at a minimum, a negligence standard, and it must either cause special harm or constitute defamation per se." *Id.*

### *Absolute Privilege*

Defendant argues that she is shielded from plaintiffs' defamation claims by absolute privilege because her letter to plaintiffs was sent in furtherance of her official duties under New York law. Dkt. #13-1, pp. 36-38.

"Under Federal decisions, it has long been held that an executive official is absolutely privileged to publish false and defamatory matter of another in the exercise of his executive function *if the matter has some relation to the executive proceeding in*

*which the official is acting*." *Cheatum v. Wehle*, 159 N.E.2d 166, 170 (N.Y. 1959) (citation omitted). *See, e.g., Gautsche v. State of New York*, 67 A.D.2d 167, 169-70 (N.Y. App. Div. 1979) (statements from Attorney General's office were absolutely privileged because they were made in connection with an investigation and prosecution of individuals charged with fraud).

"Absolute privilege does not, of course, mean that a public official can always defame with impunity." *Lombardo v. Stoke*, 222 N.E.2d 721, 724 (N.Y. 1966). "He may still be sued if the subject of the communication is unrelated to any matters within his competence . . . or if the form of the communication—e.g., a public statement—is totally unwarranted." *Id.* (citations omitted). "In such cases, absolute privilege would do great harm to individual victims without improving the service of government." *Id.* at 725 (citation and internal quotations omitted).

Absolute privilege "has been applied sparingly since it is rarely in the public interest to leave without remedy those who have been maliciously defamed." *Kilcoin v. Wolansky*, 428 N.Y.S2d 272, 276 (N.Y. App. Div. 1980) (citation omitted). "Hence, at least with respect to the executive branch, New York has been reluctant to extend the applicability of absolute privilege beyond that necessary to protect those who bear the greatest burdens of government or those to whose official functioning it is essential that they be insulated from the harassment and financial hazards that may accompany suits for damages by the victims of even malicious libels or slanders." *Id.* (citations omitted).

In *Clark v. McGee*, 404 N.E.2d 1283 (N.Y. 1980), the Court explained:

> While the absolute privilege is thus a creature of strong public policies . . ., **there do exist powerful countervailing considerations which preclude broad application or expansion of this privilege. Public office does not carry with it a license to defame at will, for even the highest officers exist to serve the public, not to denigrate its members**. Although the needs of effective government mandate that certain important officials be absolutely privileged with respect to statements made in the course of and concerning their public responsibilities, it is true that a balance must be struck between this objective and the right of an individual to defend himself against attacks upon his character. . . . **For these reasons, the privilege is not to be extended liberally, and instead must be carefully confined to that type of situation in which the protection provided by the privilege will serve a necessary societal function**.

*Id.* at 1286 (citations omitted) (emphasis added).

In determining whether absolute privilege applies, the court considers two factors: (1) the personal position or status of the speaker, and (2) the subject matter of the statement and the forum in which it is made in light of the speaker's public duties. *Doran v. Cohalan*, 509 N.Y.S.2d 289, 290-91 (N.Y. App. Div. 1986) (citations omitted). *See also Clark*, 404 N.E.2d at 1286-87 (discussing two prongs of absolute immunity analysis).

Under the second prong, it is not sufficient that the subject matter of defendant's speech merely "relate to" his public duties. *Clark*, 404 N.E.2d at 1287; *Doran*, 509 N.Y.S.2d at 53. Rather, the speech must be made "during his performance of an essential part of his public duties." *Clark*, 404 N.E.2d at 1287. *See also Park Knoll Assocs. v. Schmidt*, 451 N.E.2d 182, 209 (N.Y. 1983) ("Absolute privilege is based upon the

personal position or status of the speaker **and is limited to the speaker's official participation in the processes of government**.") (citations omitted) (emphasis added); *Kilcoin*, 428 N.Y.S.2d at 277-78 ("It is settled that, notwithstanding the position of the speaker, protection will be afforded only where the nature of the remarks and the setting in which they are made are consistent with the policy objectives of the privilege.").

Under this authority, defendant is not entitled to dismissal of plaintiffs' defamation claims based on absolute immunity.

The general duties of the New York Attorney General are set forth in New York Executive Law § 63. As relevant here, they include: the prosecution and defense of all proceedings in which the state is interested; the investigation, upon the request of the governor or other state officials, of certain indictable offenses; upon the request of the commissioner of labor or the state division of human rights, the prosecution of civil actions for discrimination; the prosecution of criminal offenses; and application to state courts for orders enjoining fraudulent or illegal acts. N.Y. Exec. Law §§ 63(1), (3), (9), (10), (12).

The letter to plaintiffs was not written to fulfill any of these duties because defendant had initiated no investigation, prosecution, or any other governmental process against plaintiffs. In fact, defendant's letter does not reference *any* actual or suspected unlawful conduct by plaintiffs.

Defendant cites no authority that would afford her absolute immunity for voicing "concerns" outside the context of some official investigation or proceeding connected with the above duties. Instead, absolute immunity shields government actors for their "official participation in the processes of government." *Doran*, 509 N.Y.S.2d at 52.

For example, *Gautsche*, on which defendant relies, involved speech by the Attorney General's office in the context of an ongoing investigation into illegal charity fraud. 67 A.D.2d at 168-69. In *Firth*, the defendant's allegedly defamatory statements were contained in a report of an investigation into corruption and criminal activity in a government agency. 785 N.Y.S.2d at 756. In *Brantley v. Mun. Credit Union*, 10 Civ. 10994 (KPF), 2021 WL 981334, at *10 (S.D.N.Y. Mar. 16, 2021), defendant's statements were contained in a press release discussing the government's regulation of a credit union and the criminal prosecution of its CEO.

Here, defendant's letter is untethered to any official process involving plaintiffs. The policy rationale insulating an official from liability for libelous speech is thus not served by affording her letter absolute immunity:

> So viewed, defendant's comments are not entitled to an absolute privilege, for the simple reason that they were not made during his performance of an essential part of his public duties. In short, a public accusation of this nature is not a central part of defendant's public responsibilities. Although there do exist strong reasons for protecting such speech, the absolute immunity at issue in this appeal was not intended to serve such a function, and there exists no reason to stretch it out of shape in order to accommodate such situations, for the

> qualified privileges mentioned above are available to protect
> any such comment not made with actual malice.

*Clark*, 404 N.E.2d at 1287.


It will thus be recommended that defendant's motion to dismiss the defamation claims on the grounds of absolute immunity be denied.[7]


### Qualified Privilege

Defendant argues in the alternative that she is protected against plaintiffs' defamation claims by qualified privilege. Dkt. #13-1, pp. 38-39.


Qualified privilege "shields individuals who, . . . act in the discharge of some public or private duty, legal or moral, or in the conduct of [her] own affairs, in a matter where h[er] interest is concerned." *Lighthouse Baptist Church v. Chemung Cnty.*, 6:20-CV-7000 EAW, 2022 WL 4290725, at *8 (W.D.N.Y. Sept. 16, 2022) (citations and internal quotation marks omitted).

---

[7] *Sindoni v. Bd. of Educ. of Skaneateless Cent. Sch. Dist.*, 190 N.Y.S.3d 788 (N.Y. App. Div. 2023), cited by defendant in her reply brief, does not advance her cause. The defendant there was a school district superintendent who made allegedly defamatory statements regarding a matter of school administration that had become the subject of public interest, and the court held that his statements were protected by absolute privilege. *Id.* at 792. This is consistent with the second prong of the absolute-privilege analysis, which considers the defendant's speech in light of his or her public duties. *Doran v. Cohalan*, 509 N.Y.S.2d 289, 290-91 (N.Y. App. Div. 1986). Here, defendant's duties lie primarily in the investigation and prosecution of civil and criminal matters. Whether her comments in the letter were made in connection with any such proceedings is thus crucial to determining whether her statements were made as an essential part of her public duties. *Clark*, 404 N.E.2d at 1287.

"In order to overcome the qualified privilege, a plaintiff must sufficiently allege that the statements were published with actual malice, *i.e.*, that defendant acted out of personal spite or ill will, with reckless disregard for the statement's truth or falsity, or with a high degree of belief that [her] statements were probably false." *Id.*

In general, the issue of actual malice is more appropriately weighed at a later stage of the proceedings than at the motion to dismiss stage." *Id.* at *9 (citation and internal quotations omitted). *See also Krusen v. Moss*, 105 N.Y.S.3d 607, 611 (N.Y. App. Div. 2019) ("Furthermore, under the circumstances of this case, discovery is necessary to allow plaintiff to explore defendant's knowledge and motivation for making the alleged defamatory statements.").

Here, plaintiffs have adequately alleged that defendant made libelous statements about them with reckless disregard for whether they were false. Dkt. #1, ¶¶14, 22, 24, 32, 33, 36, 42, 68-70, 84. Defendant's letter cited no facts, reports, or other evidence regarding her statements that plaintiffs were affiliated with racist ideology and racially motivated violence, and plaintiffs allege that she conducted no investigation before levelling such serious accusations. An inference of reckless disregard for the truth is thus reasonable, and dismissal at the pleading stage is inappropriate. *See Krusen*, 105 N.Y.S.3d at 611.[8]

---

[8] Defendant's argument that plaintiffs must allege that her statements were motivated solely by malice, Dkt. #13-1, p. 39, is not well taken because that is an alternative to the "reckless disregard" standard for malice. *See Liberman v. Gelstein*, 605 N.E.2d 344, 438 (N.Y. 1992) (explaining both the constitutional and common-law standards for malice).

It will this be recommended that defendant is not entitled to dismissal of the defamation claims on the grounds of qualified privilege.

### Actual Malice: Anti-SLAPP Law and Public Figures

Defendant next argues that plaintiffs are required to plead actual malice pursuant to New York's "anti-SLAPP" law, New York Civil Rights Law §§ 70-a, 76-a, and because plaintiffs Clark and Doyle are either public figures or limited-purpose public figures. Dkt. #13-1, pp. 39-44.

First, it is unclear whether New York's anti-SLAPP law applies in federal courts. *See Coritsidis v. Khal Bnei Torah of Mount Ivy*, 22-CV-10502 (CS), 2024 WL 37122, at *6 (S.D.N.Y. Jan. 3, 2024) (noting that "recent decisions from courts within this Circuit have concluded that New York's anti-SLAPP law does not apply in federal courts").

Second, "public figures are those who, by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention, are properly classified as public figures." *Khalil v. Fox Corp.*, 630 F. Supp. 3d 568, 583 S.D.N.Y. 2022) (citation and internal quotation marks omitted). The Court cannot say as a matter of law at this stage that the complaint's allegations regarding plaintiff Clark's success in the business world and his involvement with the ReAwaken America Tour render him a public figure. *See Satanic Temple, Inc. v. Newsweek Magazine LLC*, 661 F. Supp.3d 159, 168 (S.D.N.Y. 2023) (noting that to qualify as a "public figure," a person

must be a "household name on a national scale") (citation and internal quotation marks omitted).

Plaintiff Clark concedes, however, that he is a limited-purpose public figure, Dkt. #17, p. 19, which is "one who voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." *Id.* Plaintiff Doyle disputes that he qualifies as a limited-purpose public figure. Dkt. #17, p. 19.

The Court need not resolve these open questions, however, because it has already concluded that plaintiffs have adequately alleged, for purposes of Rule 12(b)(6), that defendant's statements were made with actual malice.

### *"Of and Concerning" Plaintiffs*

Defendant next argues that plaintiffs' defamation claims fail because the references in her letter to the Replacement Theory and white nationalist ideals did not refer to plaintiffs. Dkt. #13-1, p. 44. This argument is without merit.

To satisfy this element, plaintiffs "need only plead sufficient facts to make it plausible—not probable or even reasonably likely—that a reader familiar with [the plaintiff] would identify [the plaintiff] as the subject of the statements at issue." *Margolies v. Rudolph*, 21-CV-2447-SJB, 2022 WL 2062460, at *6 (E.D.N.Y. June 6, 2022) (citation and internal quotation marks omitted). "[T]he bar to satisfy this element is low." *Id.*

Defendant's letter was addressed to plaintiff Clark "c/o Cornerstone Church," and it copied Cornerstone below defendant's signature. Dkt. #1, pp. 21-22. As previously noted, plaintiffs allege—and the Court must accept as true—that plaintiff Doyle's name is synonymous with Cornerstone.

The first paragraph of the letter states that defendant is concerned about "past extremist statements **made by yourselves and the other featured speakers on the tour**." Dkt. #1, p. 21. This sentence thus places plaintiffs among the "featured speakers." The very next sentence states: "I am especially concerned about **featured speakers'** regular allusions to white nationalist ideals connected to the "Great Replacement Theory," a conspiracy theory that warns of white genocide and efforts to replace native born Americans with immigrants." *Id.*

Plaintiffs have thus adequately pled that these allegedly defamatory statements were "of and concerning" them.

### Fact or Opinion

Defendant next argues that her letter was not actionable because her statements were either factually correct or non-actionable opinions. Dkt. #13-1, pp.45-47.

"In determining whether a particular communication is actionable, New York courts recognize a 'distinction between a statement of opinion that implies a basis in facts

that are not disclosed to the reader or listener, and a statement of opinion that is accompanied by a recitation of the facts on which it is based or one that does not imply the existence of undisclosed underlying facts." *Brimelow v. New York Times Co.*, 20 Civ. 222 (KPF), 2020 WL 7405261, at *6 (S.D.N.Y. Dec. 17, 2020) (quoting *Gross v. New York Times Co.*, 82 N.Y.2d 146, 153 (N.Y. 1993)), *aff'd*, *Brimelow v. New York Times Co.*, 21-66-cv, 2021 WL 4901969 (2d Cir. Oct. 21, 2021).

"The former is actionable because a reasonable reader would infer that the writer knows certain facts, unknown to the audience, that support the opinion and are detrimental to the person toward whom the communication is directed; the latter is not actionable because a statement of opinion offered after a recitation of the facts on which it is based is likely to be understood by the audience as conjecture." *Id*.

In *Brimelow*, the court held that statements referring to the plaintiff as an "open white nationalist" implied the existence of undisclosed underlying facts and thus were not opinions:

> The Court concludes that the January Article's original description of Plaintiff as an "open white nationalist," considered in context, is stated as a falsifiable fact and impl[ies] the existence of undisclosed underlying facts. . . Describing Plaintiff as an "*open* white nationalist" implies that he publicly self-identifies as such, rather than that The Times is making its own judgment about how to characterize his views. Whether Plaintiff self-identifies as a "white nationalist" is verifiable, and indeed in this lawsuit Plaintiff ardently denied that he does so. ***Additionally, the article does not provide any supporting information to contextualize the characterization***.

*Id.* (emphasis added).

Here, defendant's letter implies the existence of undisclosed underlying facts, specifically: (1) "past extremist statements made by yourselves and the other featured speakers on the tour; and (1) "featured speakers' regular allusions to white nationalist ideals connected to the "Great Replacement Theory." Dkt. #1, p. 21. Defendant did not explain what these past statements or allusions were, or their context. The reader is thus left to infer that defendant knew undisclosed facts detrimental to plaintiffs, rendering the reader unable to evaluate the basis of the statements. *Brimelow*, 2020 WL 7405261, at *6.

"Accordingly, this alleged defamation cannot be dismissed as non-actionable opinion." *Id.* Cf. *Rapaport v. Barstool Sports Inc.*, 22-2080-cv, 2024 WL 88636, at * (2d Cir. Jan. 9, 2024) (statement that plaintiff was a "racist" and "fraud" were non-actionable opinion; statements did not imply that it was based on undisclosed facts known to the speaker); *Ratajack v. Brewster Fire Dep't, Inc.*, 178 F. Supp.3d 118, 165-66 S.D.N.Y. 2016) (defendant's statements that plaintiff was a "racist" were non-actionable opinion because defendant revealed the facts underlying his opinions); *Silverman v. Daily News, L.P.*, 11 N.Y.S.3d 674, (N.Y. App. Div. 2015) (defendant's statements that materials authored by plaintiff were "racist writings" and that he had ties to a "white supremacist group" were non-actionable opinions because "there was full disclosure of the facts supporting the opinions").

Furthermore, it is well established that the Court must consider "the overall context in which the complained-of assertions were made," including "the immediate context in which the disputed words appear" and "the larger context in which the statements were published, including the nature of the particular forum." *Rapaport*, 2024 WL 88636, at *2 (citation and internal quotation marks omitted).

In *Rapaport*, the Second Circuit found it important that the allegedly libelous statements were made during an acrimonious, public dispute published on social media, blogs, and sports talk radio, "which are all platforms where audiences reasonably anticipate hearing opinionated statements." *Id.* at *3.

In contrast, defendant's statements were contained in an official communication on the letterhead of the New York Attorney General, a decidedly different context and one in which the reader would likely expect circumspect, authoritative statements, not hyperbole or opinion.

It will thus be recommended that defendant's motion to dismiss plaintiffs' defamation claims be denied.[9]

---

[9] Defendant also argues that plaintiffs' defamation claim fails because plaintiff Clark initially published defendant's letter. Dkt. #13-1, p. 15 n.1; Dkt. #18, p. 10. However, plaintiffs' complaint clearly alleges that defendant "knowingly published multiple false statements to multiple media outlets." Dkt. #1, p. 2. The circumstances surrounding the publication of defendant's letter should thus be a matter for discovery.

***Defamation by Implication***

Defendant next argues that plaintiffs' complaint does not state a claim for defamation by implication.

"New York law recognizes claims for defamation by implication, which involve[ ] false suggestions, impressions and implications arising from otherwise truthful statements." *Chen v. Amazon.com, Inc.*, 23-cv-05324(EK)(ST), 2023 WL 7412219, at *5 (E.D.N.Y. Nov. 9, 2023) (citations and internal quotation marks omitted). To state such a claim, "the plaintiff must make a rigorous showing that the language of the communication as a whole can be reasonable read both to impart a defamatory inference and to affirmatively suggest that the author intended or endorsed that inference." *Id.*

Construing plaintiffs' complaint broadly, as the Court must do at this juncture, it alleges that defendant intentionally made at least two truthful statements with the intent of linking plaintiffs to racially motivated violence: (1) that the dates of the Tour coincided with the five-year anniversary of the "deadly" Unite the Right rally in Charlottesville, Virginia, and (2) that the "Great Replacement Theory"—which she accused plaintiffs, as "featured speakers,' of alluding to—is "frequently linked to violent actions, including the racially motivated mass shooting that killed 10 people at a Tops Friendly Markets store in Buffalo." Dkt. #1, p.21.

Plaintiffs allege that defendant's first statement was intended to communicate that the Tour "was intentionally meant to coincide with the rally in

Charlottesville;" that the reference to the Buffalo shooting was intended to "associate[ ] Pastor's Doyle's beliefs and those of Cornerstone Church to the causation of a local mass shooting; that defendant's intent was to create "community vitriol and spite towards" plaintiffs; that defendant's statements "intimat[ed] that the Plaintiffs would or could contribute to 'racially motivated violence;" and that defendant's statements made "false inferences and associations" in "an attempt to frame the Plaintiffs as participants in racism and white nationalism." Dkt. #1, ¶¶ 29, 34, 39, 42, 66, 68.

Given the undisclosed facts discussed above, the Court concludes that plaintiffs also have adequately pleaded a defamation by implication claim.[10]

## **CONCLUSION**

For the foregoing reasons, it is recommended that:

(1) Defendant's motion to dismiss (Dkt. #13) pursuant to Rule 12(b)(1) be denied;

(2) Defendant's motion to dismiss (Dkt. #13) plaintiffs' First Amendment retaliation claims be granted as to defendant in her official capacity and denied in all other respects;

(3) Defendant's motion to dismiss (Dkt. #13) plaintiffs' state law claims against her in her official capacity be granted;

---

[10] Defendant also argues that plaintiffs have failed to state a claim under New York Civil Rights Law § 40-c and that they lack a private right of action to enforce the New York State Bar Association rules on which they base their negligence claim. Dkt. #13-1, pp. 48. Plaintiffs did not respond to these arguments, and the Court thus assumes that they have abandoned these claims.

(4) Defendant's motion to dismiss (Dkt. #13) plaintiffs' claims for defamation and defamation by implication be denied; and

(5) Defendant's motion to dismiss (Dkt. #13) plaintiffs' claims for violation of N.Y. Civil Rights Law § 40-c and negligence be granted.

Therefore, it is hereby ORDERED pursuant to 28 U.S.C. § 636(b)(1) that:

This Report, Recommendation and Order be filed with the Clerk of the Court.

ANY OBJECTIONS to this Report, Recommendation and Order must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed .R. Civ. P. 72(b) and Local Rule 72(b).

The district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not presented to the magistrate judge in the first instance. *See, e.g., Patterson-Leitch Co. v. Massachusetts Mun. Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988).

Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order. *Thomas v. Arn*, 474 U.S.

140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 72(b) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." <u>Failure to comply with the provisions of Rule 72(b) may result in the District Judge's refusal to consider the objection.</u>

The Clerk is hereby directed to send a copy of this Report, Recommendation and Order to the attorneys for the parties.

**SO ORDERED.**

DATED:    Buffalo, New York
          March 20, 2024

          <u>s/ H. Kenneth Schroeder, Jr.</u>
          **H. KENNETH SCHROEDER, JR.**
          **United States Magistrate Judge**