**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

---

**PASTOR PAUL DOYLE,**
**CLAY CLARK,**

**Plaintiffs,**

**v.**

**23-CV-00071-JLS-HKS**

**ATTORNEY GENERAL LETITIA JAMES,**
**In her individual and official capacity,**

**Defendant.**

---

**REPORT, RECOMMENDATION & ORDER**

This case was referred to the undersigned by the Hon. John L. Sinatra, Jr., pursuant to 28 U.S.C. § 636(b)(1), for all pretrial matters and to hear and report upon dispositive motions. Dkt. #14.

This is a civil rights action arising out of a letter sent by defendant to plaintiffs on August 3, 2022 regarding a planned event at Cornerstone Church in Batavia, New York hosted by “ReAwaken America,” a conservative political movement.

Currently before the Court is defendant’s motion to dismiss plaintiffs’ complaint. Dkt. #40.

## BACKGROUND

The facts alleged by plaintiffs are set forth in a prior Report and Recommendation. Dkt. #20. Although the pleadings have not changed since this matter was remanded from the Court of Appeals following an interlocutory appeal—which will be discussed below—the Court will restate plaintiffs' allegations for purposes of completion.

### Factual Background[1]

Plaintiff Paul Doyle ("Doyle") is the Senior Pastor at Cornerstone Church in Batavia, New York. Dkt. #1, ¶ 6. Cornerstone is a small, rural church with a history of service and community outreach. Dkt. #1, ¶ 7. Cornerstone has worked to build relationships with communities of color and was aggressive in their assistance to victims of the mass shooting in Buffalo. *Id.*

Plaintiff Clay Clark ("Clark") is the owner and operator of The Thrive Time Show, a highly successful business podcast. Dkt. #1, ¶ 8. Clark has twice been named the US Small Business Association Entrepreneur of the Year and is the recipient of other business awards. *Id.*

"ReAwaken America" is a conservative political movement that hosts events throughout the country. Dkt. #1, ¶ 9. The ReAwaken America Tour ("the Tour") was

[1] "Although a court's review of a motion to dismiss is generally limited to the facts presented in the pleading, courts may still consider documents attached to the pleading as an exhibit or incorporated by reference into the pleading." *NY Citizens Audit Civic Fund, Inc. v. James*, 1:25-CV-1447 (MAD/MJK), 2026 WL 2279569, at *4 (N.D.N.Y. Aug. 7, 2026) (citing *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006)).

scheduled to host an event in Rochester, New York on August 12, 2022 at the Main Street Armory. Dkt. #1, ¶ 17. However, after community members and local politicians spoke out against the event, the Armory cancelled it. Dkt. #1, ¶¶ 17-18.

The Tour then reached out to Doyle to see if Cornerstone would be willing to host the event. Dkt. #1, ¶ 18. Doyle met with groups from Rochester to try to understand their concerns and concluded that "the Tour was not what was being portrayed in the media and by government officials." Dkt. #1, ¶ 19. Doyle thus agreed to host the event at Cornerstone "due to his strong belief that free speech should not be restricted and those who attempt to exercise it should not be intimidated, particularly by government officials." Dkt. #1, ¶ 18. The event was scheduled for August 11-13, 2022. Dkt. #1, ¶ 9.

On August 3, 2022, New York Attorney General Letitia James sent a letter addressed to Clark and General Michael Flynn—a co-organizer of the Tour—to Doyle's home address "c/o Cornerstone Church." Dkt. #1, ¶ 10. Plaintiffs allege that the letter was "nothing less than an attempt to covertly intimidate and threaten the Plaintiffs into shutting down the event." Dkt. #1, ¶ 11.

James's letter stated, in part:

> As New York's top law enforcement officer, I have significant concerns that the ReAwaken America Tour's upcoming event at the Cornerstone Church in Batavia, New York on August 12 and 13 could spur extremist or racially motivated violence. These concerns center around the event's proposed dates, which coincide with the five-year anniversary of the deadly Unite the Right rally in Charlottesville, Virginia, and past

> extremist statements made by yourselves and the other featured speakers on the tour.
>
> I am especially concerned about featured speakers' regular allusions to white nationalist ideals connected to the "Great Replacement Theory," a conspiracy theory that warns of white genocide and efforts to replace native born Americans with immigrants. The theory is frequently linked to violent actions, including the racially motivated mass shooting that killed 10 people at a Tops Friendly Markets store in Buffalo. Especially in light of this racist mass shooting, and other recent episodes of racially motivated violence in New York and throughout the country, the Office of the Attorney General is concerned that such rhetoric could contribute to violent or unlawful conduct at the ReAwaken America Tour's upcoming event.

Dkt. #1, p. 21.

The letter continued:

> The Office of the Attorney General writes to remind you that New York law prohibits racially motivated violence, harassment, or interference with another person in the exercise of their civil rights. New York Civil Rights Law § 79-n empowers the Office of the Attorney General to investigate acts of violence, intimidation, threats, or harassment directed at people based on a belief or perception regarding an individual's race, color, national origin, ancestry, gender, religion, religious practice, age, disability, or sexual orientation. In addition to actual damages, any person who violates this statute can be held liable for $5,000 in penalties for each violation.
>
> Additionally, New York Civil Rights Law § 40-c prohibits discriminating against another person in the exercise of their civil rights—including their right to peacefully protest—based on similar protected characteristics. Finally, New York Executive Law § 63(12) empowers the Office of the Attorney General to take action against any business engaged in significant fraud or illegality—including the violation of New York's civil rights laws.

> The Office of the Attorney General has a duty to protect New Yorkers from extremist and racially motivated violence. We stand ready to investigate any violation of the laws above and, if necessary, to enforce them to the fullest extent available. You are therefore instructed to take all necessary steps to ensure that the event complies fully with the requirements of New York's civil rights laws and all other applicable state and federal statutes.
>
> Your cooperation in ensuring a peaceful and law-abiding event will be greatly appreciated.

Dkt. #1, pp. 21-22.

Plaintiffs allege that James's "inferences towards racial discrimination and fraud associated with the church and the event were publicized in numerous media outlets . . . which injured Pastor Doyle's reputation, that of his church, and the reputation of Mr. Clark as well." Dkt. #1, ¶ 13. They further allege that James made no reasonable inquiry to verify her alleged concerns and that, had she done so, she would have learned "about the generous history of Cornerstone Church, the upstanding reputation of both Plaintiffs, and the fact that the Reawaken America Tour had not a single publicized act of violence at any of their events, nor has the tour been legitimately accused of any crimes, illicit behavior, or the violation of any laws or ordinances." Dkt. #1, ¶ 15. Plaintiffs also allege that they had "reached out to law enforcement and local government officials to ensure the safety of the event and that all local rules, laws, and ordinances would be followed." Dkt. #1, ¶ 19.

Plaintiffs further allege that no ReAwaken America event has ever been associated with the racial theories or violence with which James's letter purported to connect them, and her statements were "negligent, reckless and a dereliction of her duty to exercise due diligence in her representation as Attorney General and in doing so, is an abuse of power." Dkt. #1, ¶¶ 25, 33.

Plaintiffs allege that James's politically motivated letter created a "smear" on their names and damaged their community relationships. Dkt. #1, ¶ 14. The publicity surrounding James's letter resulted in "numerous cancellations of ticket sales by patrons who originally planned to attend the event prior to hearing the derisive false reports." Dkt. #1, ¶ ¶ 43-44.

Finally, plaintiffs allege that, as a result, they were forced to hire additional security to ensure the safety of the participants and attendees. Dkt. #1, ¶ 40. Ultimately, the event "went off without a single issue." Dkt. #1, ¶ 16.

**<u>Procedural Background</u>**

Plaintiffs filed this action on January 20, 2023, alleging: (1) First Amendment retaliation pursuant to 42 U.S.C. § 1983[2]; (2) defamation/libel per se; (3) violation of N.Y. Civil Rights Law § 40-c; and (4) negligence. Dkt. #1, ¶¶ 47-86.

---

[2] Plaintiffs also alleged a violation of the right to free association, but they did not pursue it. Dkt. #20, p. 20, n.5.

On April 21, 2023, defendant filed a motion to dismiss. Dkt. #13. On March 20, 2024, the undersigned issued a Report, Recommendation, and Order ("RR&O") recommending that defendant's motion be granted as to plaintiffs' First Amendment retaliation and state law claims against defendant in her official capacity, as well as plaintiff's state law claims for violation of N.Y. Civ. Rights Law § 40-c and negligence. Dkt. #20. The Court recommended that the motion to dismiss be denied in all other respects. *Id.*

Defendant filed objections to the RR&O, Dkt. #23, and, on May 13, 2024, the presiding District Court Judge adopted the RR&O. Dkt. #25.

On June 10, 2024, defendant filed a notice of interlocutory appeal. Dkt. #30. On August 19, 2025, the Court of Appeals, in a summary order not addressing the merits, vacated this Court's order denying defendant's motion to dismiss plaintiffs' First Amendment claim, citing two decisions that were issued after the Court's ruling: *Nat'l Rifle Assoc. of Am. v. Vullo*, 602 U.S. 175 (2024) and *Nat'l Rifle Assoc. of Am. v. Vullo* ("*Vullo II*"), 144 F.4th 376 (2d Cir. 2025). Dkt. #35.[3]

The Court of Appeals explained:

> In denying James's motion to dismiss plaintiff's First Amendment claim, the District Court relied on this Court's

[3] By way of review, *Vullo* was brought by the National Rifle Association ("NRA") against Maria Vullo ("Vullo"), the then-superintendent of the New York Department of Financial Services ("DFS") for alleged First Amendment violations based on meetings and letters in which Vullo pressured insurance companies to cease doing business with the NRA because of its pro-gun advocacy. *Vullo*, 602 U.S. at 181-185.

> decision in *National Rifle Association of America v. Vullo (“Vullo I”),* F.4th 700 (2d Cir. 2022), which addressed First Amendment coercion and retaliation claims. During the pendency of this appeal, the Supreme Court reversed our decision in *Vullo I*, holding that the plaintiff in that matter had adequately alleged a First Amendment violation. *See Nat’l Rifle Assoc. of Amer. v. Vullo*, 602 U.S. 175, 197 (2024). The Supreme Court remanded for further proceedings, indicating that this Court was “free to reconsider whether Vullo is entitled to qualified immunity.” *Id.* at 199 n.7. On remand, this Court issued a decision in *National Rifle Association of America v. Vullo* (“*Vullo II*”), 144 F. 4th 376 (2d Cir. 2025), addressing qualified immunity.
>
> *The District Court did not have the benefit of either the Supreme Court’s decision in Vullo or our qualified immunity ruling on remand of that matter. Accordingly, in light of these developments in the law, we vacate the District Court’s decision as to plaintiffs’ federal claim, and remand for reconsideration with the benefit of these decisions.*

Dkt. #35, pp. 2-3 (emphasis added) (footnote omitted).

The Court of Appeals also vacated the District Court’s denial of defendant’s motion to dismiss plaintiffs’ state law claim for defamation *per se*. *Id.* (“Because we vacate the District Court’s order as to plaintiffs’ federal claim, we likewise vacate as to the state law claim.”). The Court noted that, should this Court dismiss plaintiffs’ federal claim, it should consider whether to retain supplemental jurisdiction over plaintiffs’ state law claim pursuant to 28 U.S.C. § 1367(c). *Id.* at 3. However, the Court observed that if the District Court reached the merits of plaintiffs’ defamation claim, it should analyze the claim in the context of several specific New York Court of Appeals decisions. *Id.* at 3-4.

The Court now considers defendant’s renewed motion to dismiss in light of these authorities.

## DISCUSSION AND ANALYSIS

### Rule 12(b)(6)

Because this matter is before the Court at the motion-to-dismiss stage, "the Court assumes the truth of "well-pleaded factual allegations and reasonable inference[s] therefrom." *Vullo*, 602 U.S. at 181 (citation and internal quotation marks omitted).

"To survive a motion to dismiss, a party need only plead a short and plain statement of the claim, . . . with sufficient factual heft to show that the pleader is entitled to relief." *NY Citizens*, 2026 WL 2279569, at *4 (citations and internal quotation marks omitted) (cleaned up). "Under this standard, the pleading's factual allegations must be enough to raise a right to relief above the speculative level . . . and present claims that are plausible on their face." *Id.*

### First Amendment Claim

The Court will begin its analysis by reviewing the two decisions that issued while this matter was on interlocutory appeal.

#### *The Supreme Court's Decision in Vullo*

In *Vullo*, the Supreme Court considered the NRA's appeal from the Court of Appeals' decision that: (1) the NRA had not stated a plausible claim that Vullo violated the NRA's First Amendment right in certain communications with insurance companies that did business with the NRA; and (2) even if such a violation had been sufficiently pled,

Vullo was entitled to qualified immunity. *Vullo*, 602 U.S. at 186. The Court granted certiorari on only the first of these issues.

The Court began its discussion by reiterating several core principles under the First Amendment.

"At the heart of the First Amendment's Free Speech Clause is the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society." *Vullo*, 602 U.S. at 187. "The Clause prohibits government entities and actors from 'abridging the freedom of speech.'" *Id.*

However, a "government official can share her views freely and criticize particular beliefs, and she can do so forcefully in the hopes of persuading others to follow her lead." *Id.* at 188. "What she cannot do, however, is use the power of the State to punish or suppress disfavored expression." *Id.* (citation omitted).

The Supreme Court then held unanimously that the NRA had adequately alleged a First Amendment violation, reversing the Court of Appeals' decision. In so doing, the Court applied the Court's decision in *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963), wherein the Court "explored the distinction between permissible attempts to persuade and impermissible attempts to coerce." *Vullo*, 602 U.S. at 188.

The Court reiterated the teaching of *Bantam Books* that to state a claim that the government violated the First Amendment through coercion, "a plaintiff must plausibly allege conduct that, viewed in context, could be reasonably understood to convey a threat of adverse government action in order to punish or suppress the plaintiff's speech." *Id.* at 191.

The Court also stated that, consistent with *Bantam* Books and numerous Circuit authorities, this question should be analyzed using a variety of non-exhaustive factors, including the government speaker's authority; the nature and context of the communications; and the plaintiffs' reasonable understanding of the communications and their reaction to them. *Id.* at 191-194. *See also id.* at 191 ("Considerations like who said what and how, and what reaction followed, are just helpful guideposts in answering the question whether an official seeks to persuade or, instead, to coerce.").

Finally, the Court stressed that a "threat need not be explicit" to constitute impermissible coercion. *Id.* at 193.

Concluding that the Court of Appeals could only have found plaintiff's pleading of its First Amendment claim deficient "by taking the allegations in isolation and failing to draw reasonable inferences in the NRA's favor in violation of this Court's precedents," the Supreme Court vacated the Court of Appeals' decision and remanded for further proceedings. *Id.* at 198.

In a concurrence, Justice Jackson expressed her view that coercion and retaliation claims should be analyzed separately under the First Amendment. *Id.* at 199-204.

**<u>The Court of Appeals' Decision in *Vullo II*</u>**

On remand, the Court of Appeals noted, before proceeding to the merits, that it would "take up Justice Jackson's invitation to consider separately the NRA's two distinct First Amendment theories: censorship and retaliation." *Vullo*, 144 F.4th at 384. The Court explained:

> We differentiate between First Amendment claims based on impermissible coercion and retaliation theories because the two rest on temporally distinct factual allegations. Coercion involves an attempt to induce or prevent conduct *before* the fact, and it is unlawful when an official attempts to suppress or compel speech by conveying a threat of adverse action if the target does not comply. . . Retaliation, by contrast, involves punishment for conduct *after* the fact, and it is unlawful when an official takes adverse action against an entity merely because it engaged in speech that the official does not agree with. . . Given these differences, we evaluate the two theories separately.

*Id.* at 384-385 (citations omitted).

With this direction from the Court of Appeals, the Court will analyze plaintiffs' First Amendment claims under these two distinct theories.[4]

[4] *Vullo II* also addressed the issue of qualified immunity, which the Court will discuss in the analysis on that issue that follows.

***Impermissible Coercion***[5]

To state a claim that the government violated the First Amendment through coercion, "a plaintiff must plausibly allege conduct that, viewed in context, could be reasonably understood to convey a threat of adverse government action in order to punish or suppress the plaintiff's speech." *Vullo*, 144 F.4th at 385 (citation and internal quotation marks omitted).

The Court first notes that, although the parties have previously treated plaintiffs' claims under the retaliation framework, plaintiffs' complaint contains numerous allegations that fit the coercion theory:

- "DEFENDANT'S letter can be considered nothing less than an attempt *to covertly intimidate and threaten the Plaintiffs into shutting down the* event. Dkt. #1, ¶ 11.

- "Pastor Doyle and Mr. Clark have a civil right to assemble and speak, so do the attendees and participants at the Reawaken America event. *Ms. James leveraging her authority and New York law to intimidate the Plaintiff's free speech*, and right to assemble, without any rationale other than political hatred, was the only law that was violated here." Dkt. #1, ¶ 30.

- "Defendant used her position as Attorney General *to threaten Plaintiffs for expressing their political and religious views and in so doing acted in an oppressive, and threatening manner to employ coercive state power in order to injure or damage Plaintiffs*. . ." Dkt. #1, ¶ 51.

- "The Plaintiffs here have a clear First Amendment Right to assemble and speak. *When they attempted to exercise that right, the Defendant drafted and sent them a politically driven letter specifically designed to chill their speech*." Dkt. #1, ¶ 53.

[5] On this issue, the Court draws, in part, from its discussion in the prior RR&O on the issue of government speech, as the question of whether such speech is impermissibly coercive under the First Amendment entails essentially the same analysis. Dkt. #20, pp. 14-20.

- "The letter was an obvious *attempt by Ms. James to coerce the Plaintiffs into shutting down the event using covert legal threats. Further, her letter can very "reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request*." Dkt. #1, ¶ 54.

- "The letter sent by the Defendant was meant to intimidate and harass the Plaintiffs into not exercising these rights through government coercion and veiled threats of investigation and prosecution. . ." Dkt. #1, ¶ 56.

- "By attempting *to shut down the free speech of the Plaintiffs* and their right to associate *and speak freely regarding their political and/or religious viewpoints, Ms. James acted under color of state law to coerce and threaten the Plaintiffs into not exercising these rights and made references and clandestine threats to investigations and prosecutions if they did so*." Dkt. #1, ¶ 58.

(emphasis added).

Second, the Court has carefully reviewed *Vullo* and *Vullo II*, and it concludes that those decisions—as well as earlier authorities—demonstrate that plaintiffs have adequately pled a First Amendment coercion claim.

As noted, in *Vullo*, the Supreme Court reversed the Court of Appeals' determination that the NRA had failed to plead a plausible First Amendment coercion claim. *Vullo*, 602 U.S. at 180. This Court is guided by the Supreme Court's analysis that led to that conclusion.

The Supreme Court first considered Vullo's authority, observing that "[t]he power that a government official wields, while certainly not dispositive, is relevant to the objective inquiry of whether a reasonable person would perceive the official's communication as coercive." *Id.* at 191. That is, "[g]enerally speaking, the greater and

more direct the government official's authority, the less likely a person will feel free to disregard a directive from the official." *Id.* at 191-192.

The Court noted that Vullo, as DFS superintendent, had direct regulatory and enforcement authority over all insurance companies doing business in New York—the entities to whom her communications had been directed. *Id.* at 192. She also had the power to refer cases for prosecution, to notice civil charges, and to enter into consent decrees with significant monetary penalties. *Id.* The Court also observed that many of the written communications in question were on Vullo's official letterhead. *Id.* at 193-194.

Here, defendant is the Attorney General of the State of New York which, as she pointed out in the first sentence of her letter to plaintiffs, makes her "New York's top law enforcement officer." Dkt. #1, p. 21. And, as in *Vullo*, the letter at issue was on the letterhead of the Office of the Attorney General with its insignia. *Id.*

The Supreme Court also considered the nature of Vullo's communications, which alluded to regulatory infractions by the insurers which Vullo suggested she would not pursue if the insurers stopped providing insurance to gun groups. *Vullo*, 602 U.S. at 192. The Court held that such statements could reasonably be understood as a threat or inducement. *Id.* at 193.

Here, after linking plaintiffs and the event's speakers to racist theories and past incidents of racist violence, defendant listed various state anti-discrimination laws

and their penalties, concluding that her office "stand[s] ready to investigate any violation of the laws above and, if necessary, to enforce them to the fullest extent available." Dkt. #1, p. 21-22.

Plaintiffs allege that they perceived this letter as a thinly veiled threat meant to cause them to cancel the event, accompanied by the specter of prosecution. Dkt. #1, ¶¶ 11-13, 16, 20, 26, 30, 36, 41-42, 51-56.

As this Court stated in its prior RR&O:

> Here, defendant's letter has a heavy-handed, ominous tone and tells plaintiffs that: (1) she considers their own past statements concerning and "extremist," (2) she believes that "such rhetoric" could lead to "violent or unlawful conduct" at the upcoming event; and (3) she "stands ready" to investigate and enforce violations of New York laws, whose penalties she enumerates. Dkt. #1, pp. 21-22.

Dkt. #20, p. 17. Such statements might reasonably be understood as threats as opposed to a government official's speech that is "nothing more than a well-reasoned and sincere entreaty in support of his own political perspective." *Hammerhead Enters., Inc. v. Brezenoff*, 707 F.2d 33, 38 (2d Cir. 1983).

Defendant attempts to distinguish her letter from the government speech in *Vullo* and other cases where government speakers "overtly demanded" the suppression of speech. Dkt. #40-1, p. 13. Putting aside the question of whether "overtly demanded" is an accurate characterization of the speech in *Vullo*, defendant's argument is without merit

because the Supreme Court made clear that a threat by a government speaker "need not be explicit" to constitute coercion. *Vullo*, 602 U.S. at 193.

Furthermore, defendant's assertion that her letter can only be construed to convey a request to avoid or prevent unlawful conduct is unavailing at the pleading stage. Dkt. #40-1, pp. 12-14. In *Vullo*, the Supreme Court rejected such an argument:

> For the same reasons, this Court cannot simply credit Vullo's assertion that "pursuing conceded violations of the law . . .is an obvious alternative explanation" for her actions that defeats the plausibility of any coercive threat raising First Amendment concerns. . . Of course, discovery in this case might show that the allegations of coercion are false, or that certain actions should be understood differently in light of newly disclosed evidence. ***At this stage, though, the Court must assume the well-pleaded factual allegations in the complaint are true.***

*Vullo*, 602 U.S. at 195 (emphasis added).

Given this context, the fact that defendant's letter did not cause plaintiffs to cancel their event does not preclude a finding that defendant's letter was an unlawful attempt to coerce them to do so. *See Okwedy v. Molinari*, 333 F.3d 339, 344 (2d Cir. 2003) ("A public-official defendant *who threatens to employ coercive state power to stifle protected speech* violates a plaintiff's First Amendment rights.") (emphasis added).

*Vullo II* also supports plaintiffs' position. On remand from the Supreme Court, the Court of Appeals reviewed *Bantam Books* and three Court of Appeals cases—cases on which this Court relied in its prior RR&O, Dkt. #20, pp. 19-20—to note that First Amendment claims have long been viable based on a government speaker's attempt to

suppress protected expressive activity, whether the speech is directed to the speaker (as here), to a conduit for the speaker, or to a third-party associate of the speaker. *Vullo*, 144 F.4th at 385.

Therefore, construing the allegations of the complaint in plaintiffs' favor, and considering the above authorities, the Court concludes that plaintiffs have plausibly alleged that they "reasonably understood" defendant's letter to be an attempt to suppress the exercise of their First Amendment rights. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963).

***Retaliation***

The Court next considers plaintiffs' First Amendment claim under the retaliation theory.

"Where a private plaintiff sues public officials, the Second Circuit states the elements [of a retaliation claim] as follows: (1) Plaintiffs have a right protected by the First Amendment; (2) Defendants' actions were motivated or substantially caused by Plaintiffs' exercise of that right; and (3) Defendants' actions caused Plaintiffs some injury." *NY Citizens Audit Civic Fund, Inc. v. James*, 1:25-CV-1447 (MAD/MJK), 2026 WL 2279569, at *6 (N.D.N.Y. Aug. 7, 2026) (citations and internal quotation marks omitted) (cleaned up).

First, defendant does not contest that plaintiffs satisfy the first element of a retaliation claim. However, they argue that plaintiffs fail to adequately plead the second and third elements. Dkt. #40-1, pp. 15-17. The Court disagrees.

**Motivation/ Causation**

"Recognizing that a defendant's motive and intent are difficult to plead with specificity, courts in this Circuit find that it is sufficient to allege facts from which a retaliatory intent reasonably may be inferred." *Decker Advert. Inc. v. Delaware Cnty., New York*, 765 F. Supp.3d 128, 150 (N.D.N.Y. 2025) (citation and internal quotation marks omitted). This is "a low bar." *Id. See also NY Citizens*, 2026 WL 2279569, at *6 ("This threshold is not high, and a plaintiff can meet it by alleging circumstantial facts supporting an inference of retaliatory intent.") (citation and internal quotation marks omitted).

As the Court stated in its prior RR&O, plaintiffs' complaint alleges facts which, construed as true, would allow a reasonable person to infer that defendant was motivated to send her letter due to the political content of plaintiffs' speech:

- Defendant "saw the Reawaken America tour filled with her political rivals and wanted them out of the state. She then leveraged her power, authority, and official title as Attorney General of the State of New York to defame, slander, and threaten fully law-abiding citizens, a church, and its congregants who were simply and peacefully, exercising their constitutional and civil rights;

- "Pastor Doyle and Mr. Clark have a civil right to assemble and speak, so do the attendees and participants at the ReAwaken America event. Ms. James leveraging her authority and New York law to intimidate the Plaintiffs' free speech, and right to assemble, without any rationale *other than political hatred*, was the only law that was violated here;

- DEFENDANT James' letter to Plaintiffs also had the intent of creating community vitriol towards the PLAINTIFFS, which certainly increased the likelihood of violence [ ] against *the Plaintiffs and their organizations*;

- The "motivating factors for [defendant's] contemptuous letter were the political and religious viewpoints of the Plaintiffs coupled with their race and color;

- "The Plaintiffs here have a clear First Amendment Right to assemble and speak. When they attempted to exercise that right, the Defendant drafted and sent them a politically driven letter specifically designed to chill their speech;" and

- "The letter sent by the Defendant was meant to intimidate and harass the Plaintiffs into not exercising these rights through government coercion and veiled threats of investigation and prosecution into Pastor Paul and Cornerstone Church, Clay Clark, and the ReAwaken America Tour."

Dkt. #1, ¶¶ 16, 30, 39, 50, 53, 54.

Furthermore, "[t]emporal proximity between the protected activity and the alleged retaliation may be sufficient at the pleading stage" to demonstrate causation. *NY Citizens*, 2026 WL 2279569, at *7. Causation may reasonably be inferred where only a few weeks or months pass between the plaintiff's protected activity and the allegedly retaliatory action. *Id.* (citations omitted).

Here, under the allegations of the complaint, defendant sent her letter to plaintiffs shortly after their attempts to hold the ReAwaken America event in Rochester were met with public opposition, and after the event was relocated to Cornerstone Church in Batavia, New York. And, of course, it is clear from defendant's letter that she knew that plaintiffs and the event's speakers held conservative political views.

Thus, "[c]onsidering the four corners of the complaint and its attached exhibits, and without assessing the weight of any evidence or making credibility determinations, the Court finds that Plaintiffs plausibly allege causation." *Id.* at *8.

**Chilling Effect or Other Harm**

Next, defendant argues that plaintiffs fail to adequately plead that defendant's actions caused them legally cognizable harm. Dkt. #40-1, at p. 16.

The Court discussed the issue of harm in its prior RR&O in the context of standing, noting that "[v]arious non-speech related harms are sufficient to give a plaintiff standing" for purposes of a First Amendment retaliation claim. Dkt. #20, pp. 8 (quoting *Dorsett v. Cnty. of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013)). In particular, the Court reviewed authority holding that "reputational harms" may constitute such an injury. Dkt. #20, pp. 8-9 (discussing *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021)).

The Court observed:

> Here, plaintiffs' complaint is replete with allegations that defendant's letter falsely associated them with racist, "white nationalist ideals;" the "Great Replacement Theory;" a racially motivated shooting in Buffalo, New York; and other "racially motivated violence." Dkt. #1, ¶¶ 13, 21, 27, 42, 64, 68. Plaintiffs allege specific damages flowing from defendant's statements: injury to plaintiffs' reputations; harm to Doyle's community relationships, and specifically with communities of color; and an increased likelihood of violence towards plaintiffs. Dkt. #1, ¶¶ 13, 14, 39, 43, 53, 64.

Dkt. #20, p. 9.

The Court also noted that where plaintiffs allege harm that is sufficient for Article III standing, that harm is also sufficient under Second Circuit authority to meet the requirement of injury for purposes of a First Amendment retaliation claim. Dkt. #20, p. 13.

Thus, construing the above allegations in plaintiffs' favor, the Court concludes that they have sufficiently alleged injury for purposes of their retaliation claim. *See NY Citizens*, 2026 WL 2279569, at *8 (holding that plaintiffs adequately pled injury for First Amendment claim where they alleged that defendants' allegedly false and defamatory statements caused an exodus of volunteers from their organization and harmed their ability to continue their operations); *Bachman v. Town of Greece*, 6:25-CV-06086 EAW, 2025 WL 3525032, at *4 (W.D.N.Y. Dec. 9, 2025) (denying motion to dismiss First Amendment retaliation claim; plaintiffs adequately alleged injury of reputational and emotional harm).

It will thus be recommended that defendant's motion to dismiss plaintiffs' First Amendment claim for inadequate pleading be denied.[6]

---

[6] Defendant argues that plaintiffs insufficiently allege that defendant published the letter. Dkt. #40-1, pp. 16-17. However, as the Court previously noted, plaintiffs allege that defendant "knowingly published multiple false statements to multiple media outlets," Dkt. #1, p. 2, and the Court believes that the facts surrounding the letter's publication or related statements to the media are proper subjects for discovery.

***Qualified Immunity***

"While qualified immunity is ordinarily an affirmative defense asserted in an answer, a defendant can properly raise a qualified immunity defense in a pre-answer 12(b)(6) motion to dismiss." *Whelan v. Parisi*, 25-CV-03000 (PMH), 2026 WL 2323431, at *7 (S.D.N.Y. Aug. 11, 2026) (citing *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004)). "A 12(b)(6) motion based on qualified immunity may be granted if the facts supporting the defense appear on the face of the complaint." *Id.* (citations and internal quotation marks omitted).

"A defendant bears the burden of establishing that he is entitled to qualified immunity." *Id.* "Consequently, when a defendant raises a qualified immunity defense in a 12(b)(6) motion to dismiss, the defendant must accept that the plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also that defeat the immunity defense." *Id.*

"Thus, at the motion to dismiss stage, the qualified immunity defense faces a formidable hurdle. . .and is usually not successful because it is the *defendant* that must plead and prove the defense." *Id.* (cleaned up). *See also Greco v. City of New York*, 686 F. Supp.3d 191, 202 (E.D.N.Y. 2023) ("The Second Circuit has rejected qualified immunity defenses raised in motions to dismiss in opposition to First Amendment retaliation claims.") (citations and internal quotation marks omitted).

"The doctrine of qualified immunity protects officials from liability for civil damages when (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Whelan*, 2026 WL 2323431, at *7. A government official's conduct "violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Id.*

"The contours of a right are sufficiently clear if there is a case in which an officer acting under similar circumstances. . .was held to have violated the Constitution." *Id.* (citations and internal quotation marks omitted). "In other words, if an official could have read the relevant precedent beforehand and known that it proscribed their specific conduct, then they are not entitled to qualified immunity." *Id.* (cleaned up).

"On the other hand, the Supreme Court has also emphasized that, while the contours of the right must be sufficiently clear[,] that is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful." *Vega v. Semple*, 963 F.3d 259, 275 (2d Cir. 2020) (" (citations and internal quotation marks omitted).

Having reviewed this matter carefully, the Court concludes that defendant's invocation of the defense of qualified immunity at the pleading stage is unavailing.

First, the facts asserted by defendant in support of this defense do not appear on the face of the complaint. *Whelan v. Parisi*, 2026 WL 2323431, at *7. Instead, as noted above, defendant relies on her alternative explanation of the intent and meaning of her letter: to raise concerns about potential unlawful conduct at the ReAwaken America event. Dkt. #40-1, pp. 18-19. But plaintiffs plausibly allege that they reasonably perceived a different meaning: that defendant's statements were veiled coercive and retaliatory threats intended to cause plaintiffs to cancel the event because of their political speech.

As the Supreme Court noted in *Vullo*, the Court may not credit the defendant's alternative explanation of her speech over plaintiffs' well-pleaded factual allegations at the pleading stage. *Vullo*, 602 U.S. at 195. *See also Greco*, 686 F. Supp.3d at 202 (denying motion to dismiss plaintiff's First Amendment retaliation claim on qualified immunity grounds because claim "turns on the subjective intent that NYPD officials had when they investigated and terminated him").

Second, it has long been clearly established that "implied threats to employ coercive state power to stifle protected speech" violate the First Amendment. *Hammerhead Enters., Inc. v. Brezenoff*, 707 F.2d 33, 39 (2d Cir. 1983).

In 2003, the Court of Appeals reversed the dismissal of a complaint filed by plaintiffs against the Borough President of Staten Island who sent a letter to a billboard company with whom plaintiffs had contracted to produce and display billboards conveying plaintiffs' beliefs that, under biblical teachings, homosexuality is a sin. *Okwedy v. Molinari*,

333 F.3d 339 (2d Cir. 2003). The letter stated that defendant and many community members found the billboards offensive, noting that the company "derives substantial economic benefits" from billboards on Staten Island and asking the company to contact defendant's legal counsel to discuss the matter. *Id.* at 341-342. The billboard company took the signs down the same day. *Id.* at 342.

The Court of Appeals held that plaintiffs had adequately pled a First Amendment claim; that a jury could find that the defendant's letter contained "an implicit threat of retaliation;" and that a "public-official defendant who threatens to employ coercive state power to stifle protected speech violates a plaintiff's First Amendment rights." *Id.* at 344.

Defendant cites *Okwedy* and other Circuit precedent, stating: "But there are no cases applying that general principle in a context where a law enforcement official raised concerns about unlawful conduct at an upcoming public event and instructed the event's organizers to ensure that the event complied with the law." Dkt. #40-1, p. 18.

This argument is without merit for two reasons. First, it adopts defendant's construction of the letter which, as already noted, is at odds with the allegations of plaintiff's complaint and thus improper at the pleading stage. *See also Wang v. Delphin-Rittmon*, 664 F. Supp.3d 205, 220 (D. Conn. 2023) ("Yet when a defendant raises a defense of qualified immunity at the initial pleadings stage, a court must take care not to

engage in a premature determination of the facts in a manner at odds with those facts that the plaintiff has pleaded in the complaint.").

Second, this description of the letter is too granular, *i.e.*, it describes the factual context at such a level of specificity that qualified immunity would apply unless there was a case with nearly identical facts. But the Supreme Court, the Court of Appeals, and courts within the Second Circuit have rejected this tactic in qualified immunity cases. *See, e.g., Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (noting that "officials can still be on notice that their conduct violates established law even in novel factual circumstances"); *Vega*, 963 F.3d at 275 ("By framing the relevant right too narrowly, we may unduly permit officials to escape liability."); *Hancock v. Cnty. of Rensselaer*, 882 F. 3d 58, 69 (2d Cir. 2018) ("[Q]ualified immunity law does not require a case on point concerning the exact permutation of facts that state actors confront in order to establish a clear standard for their behavior.") (citation omitted); *McCrae v. Town of Brookhaven*, 759 F. Supp.3d 372, 393 (E.D.N.Y. 2024) ("Importantly, for a right to be 'clearly established,' the Court is not required to identify a previous case with factually identical circumstances.").[7]

Finally, the decisions in *Vullo* and *Vullo II* support the conclusion that plaintiffs' right to be free from the allegedly coercive and retaliatory veiled threats in defendant's letter was clearly established in 2022.

---

[7] The Court does not find relevant defendant's argument that Attorneys General routinely issue warnings to private parties to follow the law. Dkt. #40-1, pp. 18-20.

The Supreme Court noted in *Vullo*:

> *Six decades ago, this Court held that a government entity's "threat of invoking legal sanctions and other means of coercion" against a third party "to achieve the suppression" of disfavored speech violates the First Amendment. Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 67. . .(1963).* Today the Court reaffirms what it said then: Government officials cannot attempt to coerce private parties in order to punish or suppress views that the government disfavors.
>
> . . .
>
> *The Court does not break new ground in deciding this case. It only reaffirms the general principle from Bantam Books that where, as here, the complaint plausibly alleges coercive threats aimed at punishing or suppressing disfavored speech, the plaintiff states a First Amendment claim.*

*Vullo*, 602 U.S. at 180, 197 (emphasis added).

And in *Vullo II*, the Court of Appeals discussed at length the caselaw dating from *Bantam Books* to *Okwedy*, acknowledging that these cases established that government efforts to coerce or suppress the expressive conduct of a private party—either by communicating directly with the speaker or with a conduit of the speaker's speech—run afoul of the First Amendment. *Vullo II*, 144 F.th at 385-386.

The Court then distinguished the context of Vullo's actions from the facts of those cases:

> Here, Vullo is not alleged to have targeted a speaker (the NRA) or a conduit for the NRA's speech (for example, a publisher) but third-party, regulated entities. Moreover, the coercive conduct alleged was not directed at speech or expressive conduct but at non-expressive activity, *i.e.*, underwriting insurance policies.

*Id.* at 386. Based on this distinction, the Court then held that Vullo was entitled to qualified immunity:

> [W]e hold here that qualified immunity is proper only because no case (or set of cases) had clearly established, by the time of Vullo's conduct, *that exercising regulatory power to pressure third-party regulated entities into refraining from nonexpressive activity and disassociating from a plaintiff crossed the line from persuasion into impermissible coercion and retaliation*. In other words, Vullo is entitled to qualified immunity *because the effect of her alleged coercion of and retaliation against these regulated entities on the NRA's speech is significantly more attenuated here than in the cases cited above*.

*Id.* at 391 (emphasis added).[8]

The Court of Appeals then specifically distinguished the *Bantam Books* to *Okwedy* line of cases, noting that in those cases: (1) they "addressed only coercive conduct aimed at expressive activity, either through the speaker or some conduit for the speaker"; (2) "the nexus between the defendant's coercive conduct and the eventual infringement of the plaintiff's First Amendment rights was clear"; and (3) the "conduct sought to stop the speech itself." *Id.* at 392.

This discussion is effectively a road map to the conclusion that defendant here is not entitled to qualified immunity, especially at the pleading stage, because plaintiffs allege that defendant directly targeted private-party speakers in an effort to suppress their expressive conduct.

---

[8] The Supreme Court denied plaintiff's petition for certiorari following the decision in *Vullo II*. *Nat'l Rifle Ass'n of Am. v. Vullo*, 146 S.Ct. 1628 (Feb. 23, 2026).

It will therefore be recommended that defendant is not entitled to dismissal of plaintiffs' First Amendment claim on the basis of qualified immunity.

**Defamation Claim – Absolute Privilege**

The final issue raised in defendant's motion is defendant's argument that she is entitled to dismissal of plaintiffs' defamation claim on the grounds of absolute privilege. Dkt. #40-1, pp. 20-26.

The Court first notes that it has carefully reviewed the cases cited by the Court of Appeals in its remand order, as well as those cited by defendant in her papers. Having concluded that these authorities do not support a recommendation different from that contained in the Court's prior RR&O, the Court will draw from its prior analysis while also addressing these additional authorities.

"Under Federal decisions, it has long been held that an executive official is absolutely privileged to publish false and defamatory matter of another in the exercise of his executive function ***if the matter has some relation to the executive proceeding in which the official is acting***." *Cheatum v. Wehle*, 159 N.E.2d 166, 170 (N.Y. 1959) (citation omitted). *See, e.g., Gautsche v. State of New York*, 67 A.D.2d 167, 169-70 (N.Y. App. Div. 1979) (statements from Attorney General's office were absolutely privileged because they were made in connection with an investigation and prosecution of individuals charged with fraud).

"Absolute privilege does not, of course, mean that a public official can always defame with impunity." *Lombardo v. Stoke*, 222 N.E.2d 721, 724 (N.Y. 1966). "He may still be sued if the subject of the communication is unrelated to any matters within his competence . . . or if the form of the communication—e.g., a public statement—is totally unwarranted." *Id.* (citations omitted). "In such cases, absolute privilege would do great harm to individual victims without improving the service of government." *Id.* at 725 (citation and internal quotations omitted).

Absolute privilege "has been applied sparingly since it is rarely in the public interest to leave without remedy those who have been maliciously defamed." *Kilcoin v. Wolansky*, 428 N.Y.S2d 272, 276 (N.Y. App. Div. 1980) (citation omitted). "Hence, at least with respect to the executive branch, New York has been reluctant to extend the applicability of absolute privilege beyond that necessary to protect those who bear the greatest burdens of government or those to whose official functioning it is essential that they be insulated from the harassment and financial hazards that may accompany suits for damages by the victims of even malicious libels or slanders." *Id.* (citations omitted). *See also Park Knoll Assoc. v. Schmidt*, 59 N.Y.2d 205, 210 (1983) ("As a matter of policy, the courts confine absolute privilege to a very few situations.") (citations omitted).

In *Clark v. McGee*, 404 N.E.2d 1283 (N.Y. 1980), the Court explained:

> While the absolute privilege is thus a creature of strong public policies . . ., ***there do exist powerful countervailing considerations which preclude broad application or expansion of this privilege. Public office does not carry***

> ***with it a license to defame at will, for even the highest officers exist to serve the public, not to denigrate its members***. Although the needs of effective government mandate that certain important officials be absolutely privileged with respect to statements made in the course of and concerning their public responsibilities, it is true that a balance must be struck between this objective and the right of an individual to defend himself against attacks upon his character. . . . ***For these reasons, the privilege is not to be extended liberally, and instead must be carefully confined to that type of situation in which the protection provided by the privilege will serve a necessary societal function***.

*Id.* at 1286 (citations omitted) (emphasis added).

In determining whether absolute privilege applies, the court considers two factors: (1) the personal position or status of the speaker, and (2) the subject matter of the statement and the forum in which it is made in light of the speaker's public duties. *Doran v. Cohalan*, 509 N.Y.S.2d 289, 290-91 (N.Y. App. Div. 1986) (citations omitted). *See also Clark*, 404 N.E.2d at 1286-87 (discussing two prongs of absolute immunity analysis).

Under the second prong, it is not sufficient that the subject matter of defendant's speech merely "relate to" his public duties. *Clark*, 404 N.E.2d at 1287; *Doran*, 509 N.Y.S.2d at 53. Rather, the speech must be made "during his performance of an essential part of his public duties." *Clark*, 404 N.E.2d at 1287. *See also Park Knoll*, 451 N.E.2d at 209 ("Absolute privilege is based upon the personal position or status of the speaker ***and is limited to the speaker's official participation in the processes of government***.") (citations omitted) (emphasis added); *Kilcoin*, 428 N.Y.S.2d at 277-78 ("It is settled that, notwithstanding the position of the speaker, protection will be afforded only

where the nature of the remarks and the setting in which they are made are consistent with the policy objectives of the privilege.”).

Under this authority, defendant is not entitled to dismissal of plaintiffs’ defamation claims based on absolute immunity.

The general duties of the New York Attorney General are set forth in New York Executive Law § 63. As relevant here, they include: the prosecution and defense of all proceedings in which the state is interested; the investigation, upon the request of the governor or other state officials, of certain indictable offenses; upon the request of the commissioner of labor or the state division of human rights, the prosecution of civil actions for discrimination; the prosecution of criminal offenses; and application to state courts for orders enjoining fraudulent or illegal acts. N.Y. Exec. Law §§ 63(1), (3), (9), (10), (12).

In her current papers, defendant also cites N.Y. Exec. Law § 79-n(3), which provides that the attorney general may apply in the name of the state to a court to enjoin unlawful bias-related violence of intimidation. Dkt. #40-1, p. 22. She also cites a penalty provision of an equal rights law that states that notice of any action under that section must be served on the attorney general. N.Y. Exec. Law § 40-d.

However, the letter to plaintiffs was not written to fulfill any of these duties because defendant had initiated no investigation, prosecution, or any other governmental process against plaintiffs. In fact, defendant does not argue that plaintiffs had engaged in

any actual or suspected acts that would fall within the scope of her law-enforcement authority.

Contrary to defendant's argument, this is an important, if fine, distinction. Absent some factual predicate for a government official to believe that a citizen may have engaged in conduct that warrants the scrutiny of his or her office, that official is performing no duties that the doctrine of absolute privilege is meant to protect. *See Clark*, 404 N.E.2d at 1287 ("Absent such a connection, application of an absolute privilege would effectuate no fundamental public interest.").

Instead, defendant's view of this doctrine would shield gratuitous defamatory speech directed at a private citizen by a government official even where the citizen was not the subject of legitimate scrutiny within the purview of the official's duties.

Indeed, defendant cites no authority that would afford her absolute immunity for voicing "concerns" outside the context of some official investigation or proceeding connected with the above duties. Instead, absolute immunity shields government actors for their "official participation in the processes of government." *Doran*, 509 N.Y.S.2d at 52.[9]

---

[9] Defendant cites *Stevens v. New York State Div. of Crim. Just. Servs.*, 227 N.E.3d 1064 (N.Y. 2023), for the proposition that the attorney general's authority extends not only to statutory authority, but to "any powers required by necessary implication." *Stevens* is inopposite, however, as it dealt with the powers of regulatory agencies to promulgate regulations, and it has no application to the facts of this case.

Defendant also cites *Gautsche* to argue that she is privileged to engage in defamatory speech where she identifies situations in which "laws" might be violated and "instruct[s] relevant individuals to comply with those laws." Dkt. #40-1, p. 22. This is disingenuous, though, because the challenged speech in *Gautsche* occurred *after* the Attorney General's office commenced legal action targeting charity fraud in New York City. *Gautsche*, 67 A.D.2d at 168-169.

Other cases also support the conclusion that the absolute privilege for government speech is triggered only after the official has initiated some action in the enforcement of his governmental authority. In *Firth v. State of New York*, 785 N.Y.S.2d 755 (N.Y.A.D. 3d Dept. 2004), the defendant's allegedly defamatory statements were contained in a report of an investigation into corruption and criminal activity in a government agency. *Id.* at 756. In *Brantley v. Mun. Credit Union*, 10 Civ. 10994 (KPF), 2021 WL 981334, at *10 (S.D.N.Y. Mar. 16, 2021), defendant's statements were contained in a press release discussing the government's regulation of a credit union and the criminal prosecution of its CEO.

Defendant also cites several cases to argue that public officials "need not initiate a formal governmental process to speak within the scope of their duties." Dkt. #40-1. This is a straw man argument, however, because the government actors in those cases—a college president, city borough president, school superintendent, school board members, and a county health commissioner—were not law enforcement officials or prosecutors where such formal proceedings would be expected.

Here, because defendant is the Attorney General—the state's top law enforcement officer—the relevant analysis of the context of her challenged speech naturally entails consideration of whether it occurred while she was taking steps to investigate or prosecute a violation of New York law. *Gautsche*, 67 A.D.2d at 169-170.

Defendant's letter, however, is untethered to any official action or process involving plaintiffs. The policy rationale for insulating an official from liability for libelous speech is thus not served by affording her letter absolute immunity:

> So viewed, defendant's comments are not entitled to an absolute privilege, for the simple reason that they were not made during his performance of an essential part of his public duties. In short, a public accusation of this nature is not a central part of defendant's public responsibilities. Although there do exist strong reasons for protecting such speech, the absolute immunity at issue in this appeal was not intended to serve such a function, and there exists no reason to stretch it out of shape in order to accommodate such situations, for the qualified privileges mentioned above are available to protect any such comment not made with actual malice.

*Clark*, 404 N.E.2d at 1287.

Finally, the Court has reviewed the three cases cited by the Court of Appeals in its remand order.

In *Gottwald v. Sebert*, 40 N.Y.3d 240 (N.Y. 2023), the Court held that certain statements by the defendant were covered by the absolute privilege afforded to statements made in connection with judicial proceedings. *Id.* at 253-254. The Court also

held that issues of fact existed as to the applicability of the pre-litigation privilege—which applies to "statements made in anticipation of good-faith litigation"—as well as the "fair reporting" privilege. *Id.* at 154-255. None of these privileges are at issue in this matter, as defendant concedes in her memorandum in support of her motion to dismiss. Dkt. #40-1, p. 25.

Similarly, in *Rosenberg v. Metlife, Inc.*, 866 N.E.2d 439 (N.Y. 2007), the Court answered the following certified question from the Court of Appeals for the Second Circuit: "whether statements made by an employer on a National Association of Securities Dealers (NASD) employee termination notice (Form U-5) are subject to an absolute or qualified privilege in a defamation lawsuit." *Id.* at 440. The Court observed that the NASD's investigation and adjudication of suspected securities violations is a "quasi-judicial" process, and that the compulsory U-5 form "can be viewed as a preliminary or first step" in that process. *Id.* at 444. The Court thus held that statements by an employer on employee termination notices are subject to an absolute privilege in defamation suits. *Id.* at 445.

*Rosenberg* has no application here because defendant's statements were not made as part of, or as a preliminary step in, any judicial or quasi-judicial process.

Finally, in *Wiener v. Weintraub*, 22 N.Y.2d 330 (N.Y. 1968), the Court held that proceedings before a Grievance Committee of a bar association constitute "judicial proceedings," and that statements in a letter submitted by defendants to that committee

were thus absolutely privileged as statements made in the course of judicial proceedings. *Id.* at 331-332. Here, of course, defendant's allegedly defamatory statements were not made during the course of any judicial proceeding.

The Court thus concludes that these three cases do not aid in the analysis on this issue.

It will thus be recommended that defendant's motion to dismiss the defamation claims on the grounds of absolute immunity be denied.

## CONCLUSION

For the foregoing reasons, it is recommended that defendant's motion to dismiss (Dkt. #40) be denied.

Therefore, it is hereby ORDERED pursuant to 28 U.S.C. § 636(b)(1) that:

This Report, Recommendation and Order be filed with the Clerk of the Court.

ANY OBJECTIONS to this Report, Recommendation and Order must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed .R. Civ. P. 72(b) and Local Rule 72(b).

The district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not presented to the magistrate judge in the first instance. *See, e.g., Patterson-Leitch Co. v. Massachusetts Mun. Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988).

Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 72(b) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." Failure to comply with the provisions of Rule 72(b) may result in the District Judge's refusal to consider the objection.

The Clerk is hereby directed to send a copy of this Report, Recommendation and Order to the attorneys for the parties.

**SO ORDERED.**

DATED: Buffalo, New York

September 22, 2026

**s/ H. Kenneth Schroeder, Jr.**
**H. KENNETH SCHROEDER, JR.**
**United States Magistrate Judge**