UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

PASTOR PAUL DOYLE, and
CLAY CLARK,

Plaintiffs,

vs.

ATTORNEY GENERAL LETITIA JAMES, in her individual and official capacity,

Defendant.

Case No. 23-cv-00071-JLS-HKS

**DEFENDANT'S OBJECTIONS TO THE REPORT, RECOMMENDATION & ORDER**

LETITIA JAMES
Attorney General of the State of New York
DANIEL R. MAGUIRE
STEPHANIE J. CALHOUN
Assistant Attorneys General, of Counsel
Main Place Tower, Suite 300A
350 Main Street
Buffalo, New York 14202
Tel: (716) 853-8419

## TABLE OF CONTENTS


PRELIMINARY STATEMENT ........ 4

STATEMENT OF FACTS ........ 4

A. The ReAwaken America Tour's Planned Event ........ 4

B. Attorney General James's Letter to the Tour's Organizers ........ 5

C. Plaintiffs' Conclusory Allegations About the Purpose and Motivation Behind the Letter ........ 6

D. Plaintiffs' Conclusory Allegations About the Consequences of the Letter ........ 7

PROCEDURAL BACKGROUND ........ 7

ARGUMENT ........ 9

POINT I ATTORNEY GENERAL JAMES HAS QUALIFIED IMMUNITY FROM PLAINTIFFS' FIRST AMENDMENT CLAIM ........ 10

A. Plaintiffs Did Not Plausibly Allege That Attorney General James Violated Their First Amendment rights. ........ 10

1. Plaintiffs did not plausibly allege an impermissible coercion claim. ........ 10

2. Plaintiffs did not plausibly allege a retaliation claim. ........ 12

B. In Any Event, Attorney General James' Letter Did Not Violate Clearly Established Law ........ 14

POINT II ATTORNEY GENERAL JAMES HAS ABSOLUTE PRIVILEGE FROM PLAINTIFFS' DEFAMATION CLAIM ........ 18

CONCLUSION ........ 21

# TABLE OF AUTHORITIES

## Cases


*Ashcroft v. al-Kidd*,
563 U.S. 731 (2011) .......... 10

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963) .......... 11

*Brantley v. Mun. Credit Union*,
2021 WL 981334 (S.D.N.Y. Mar. 16, 2021) .......... 19

*Collick v. Hughes*,
699 F.3d 211 (2d Cir. 2012) .......... 15

*Dorsett v. County of Nassau*,
732 F.3d 157 (2d Cir. 2013) .......... 13, 14

*Firth v. State of New York*,
785 N.Y.S.2d 755 (3d Dep't 2004) .......... 19

*Garcia v. Astrue*,
10 F. Supp. 3d 282 (N.D.N.Y. 2012) .......... 9

*Gonzalez v. City of Schenectady,*
728 F.3d 149 (2d Cir. 2013) .......... 14

*Gottwald v. Sebert*,
40 N.Y.3d 240 (2023) .......... 19

*Grice v. McVeigh,*
873 F.3d 162 (2d Cir. 2017) .......... 15

*Hammerhead Enterprises, Inv. v. Brezenoff*,
707 F.2d 33 (2d Cir. 1983) .......... 12, 16

*Jeffery v. Fayetteville-Manlius Cent. Sch. Dist.*,
222 A.D.3d 1366 (4th Dep't 2023) .......... 19

*Jones v. Treubig*,
963 F.3d 214 (2d Cir. 2020) .......... 15

*Lombard v. Stoke*,
18 N.Y.2d 394 (1966) .......... 18

*Mullenix v. Luna*,
577 U.S. 7 (2015) .......... 15, 17

*Nat'l Rifle Assoc. of Amer. V. Vullo*,
602 U.S. 175 (2024) .......... passim

*National Rifle Association of America v. Vullo* ("*Vullo II*"),
144 F.4th 376 (2d Cir. 2025) .......... 9, 13

*Niles v. Wilshire Inv. Grp., LLC*,
859 F. Supp. 2d 308 (E.D.N.Y. 2012) ........ 10

*Okwedy v. Molinari*,
333 F.3d 339 (2d Cir. 2003) ........ 11

*Rosenberg v. MetLife, Inc.*,
8 N.Y.3d 359 (2007) ........ 20

*Schell v. Dowling*,
240 A.D.2d 721 (2d Dep't 1997) ........ 19

*Sindoni v. Bd. of Educ. of Skaneateles Cent. Sch. Dist.*,
217 A.D.3d 1363 (4th Dep't 2023) ........ 18

*Stanton v. Sims*,
571 U.S. 3 (2013) ........ 14

*Suarez Corp. Indus. V. McGraw*,
202 F.3d 676 (4th Cir. 2000) ........ 13

*Tripathy v. Schneider*,
2024 WL 1107892 (W.D.N.Y. March 14, 2024) ........ 9

*VDARE Found. v. City of Colorado Springs*,
11 F.4th 1151 (10th Cir. 2021) ........ 16

*Whiteside v. Hover-Davis, Inc.*,
995 F.3d 315 (2d Cir. 2021) ........ 13

*Wiener v. Weintraub*,
22 N.Y.2d 330 (1968) ........ 19

*X-Men Sec., Inc. v. Pataki*,
196 F.3d 56 (2d Cir. 1999) ........ 13

*Zieper v. Metzinger*,
474 F.3d 60 (2d Cir. 2007) ........ 11

**Statutes**

28 U.S.C. § 636(b)(1)(C) ........ 9

42 U.S.C. § 1983 ........ 7

N.Y. Exec. Law § 63(12) ........ 18

New York Civil Rights Law § 40-c ........ 7

**Treatises**

Lainie Rutkow & Stephen P. Teret, *The Potential for State Attorneys General to Promote the Public's Health: Theory, Evidence, and Practice,* 30 St. Louis U. Pub. L. Rev. 267, 276-77 (2011) ........ 16

## PRELIMINARY STATEMENT

Defendant Attorney General Letitia James ("Attorney General James" or the "Attorney General") submits this memorandum of law in support of her objections to the Report, Recommendation and Order ("R&R") of the Hon. H. Kenneth Schroeder, Jr., United States Magistrate Judge, filed September 22, 2026 ("R&R") (ECF No. 47), which recommended denying Attorney General James's partial motion to dismiss. This Court should reject the R&R and grant the partial motion to dismiss.

## STATEMENT OF FACTS

### A. The ReAwaken America Tour's Planned Event

The ReAwaken America Tour (the "Tour") is a "conservative political movement/tour" that hosts events throughout the country. Compl., ECF No. 1, ¶ 9. The Tour is organized by plaintiff Clay Clark, who operates a successful business podcast and consulting firm, and General Michael Flynn. *Id.* at ¶¶ 8, 10.

The Tour was scheduled to host an event in Rochester, New York, on August 12, 2022. Almost immediately after the event was scheduled, community leaders and politicians began to call for its cancellation. Because of the "massive backlash and slanderous statements from government official and politicians," the event was cancelled by the venue that had originally agreed to host it. *Id.* at ¶ 18.

The Tour's organizers then reached out to plaintiff Paul Doyle, the senior pastor at Cornerstone Church, to see if his church would host the event. *Id.* at ¶¶ 6, 18. Cornerstone Church is located in Batavia, New York, and has approximately 100 to 150 parishioners. Pastor Doyle accepted the Tour's invitation to host the event at the Cornerstone Church. *Id.* at ¶¶ 9, 19. In planning the event, Doyle and Clark reached out to law enforcement and government officials

to ensure that the venue would be safe and that all local ordinances and rules would be followed. Doyle also met with multiple groups opposed to the event to better understand their concerns. After meeting with the groups, Doyle determined that the Tour was not being accurately portrayed in the media and by government officials. *Id.* at ¶ 19.

Plaintiffs allege that they are law-abiding citizens and that neither they nor the Tour have a history of violence or unlawful behavior. *Id.* at ¶ 15. Plaintiffs further allege that no Tour event has been associated with the "Great Replacement" theory.

**B. Attorney General James's Letter to the Tour's Organizers**

A week before the Tour's planned event, Attorney General James sent the Tour's organizers a letter. Compl., Ex. A. The letter was addressed to the Tour's organizers, plaintiff Clark and General Flynn, in the care of Cornerstone Church.

In the letter, the Attorney General explained that, as New York's chief law enforcement officer, she had "significant concerns" that the Tour's upcoming event "could spur extremist or racially motivated violence." She articulated two bases for this concern. First, the scheduled date of the event coincided with the fifth anniversary of the Unite the Right Rally in Charlottesville, Virginia, at which racially motivated violence had occurred. Second the event's organizers and other featured speakers had previously made extremist statements, including regular allusions by some speakers to white-nationalist ideals connected to the "Great Replacement Theory." The Attorney General described this theory as a conspiracy theory that warns of white genocide in efforts to replace "native-born" Americans with immigrants. This theory, she explained, is linked to several recent episodes of racially motivated violence, including a mass shooting that had occurred several months earlier in Buffalo, New York.

Accordingly, "such rhetoric could contribute to violent or unlawful conduct" at the Tour's event. *Id.*

The Attorney General advised the event's organizers that New York's civil rights laws prohibit racially motivated violence, harassment, or interference with another person in the exercise of their civil rights—including their right to peacefully protest—and that any person who violates this prohibition could be subject to a $5,000 penalty for each violation. The Attorney General explained that her office has a duty to protect New Yorkers from extremist and racially motivated violence and stands ready to investigate violations of the cited laws and, if necessary to enforce them to the fullest extent available. *Id.*

In closing, the Attorney General instructed the event's organizers "to take all necessary steps to ensure that the event complies fully" with New York's civil rights laws and other state and federal laws, and she expressed appreciation in advance for the organizers' "cooperation in ensuring a peaceful and law-abiding event." *Id.*

**C. Plaintiffs' Conclusory Allegations About the Purpose and Motivation Behind the Letter**

Plaintiffs allege that the Attorney General's letter "can be considered nothing less than an attempt to intimidate and threaten the Plaintiffs into shutting down the event." Compl. ¶ 11. Plaintiffs further allege that the Attorney General "saw the ReAwaken America tour filled with her political rivals and wanted them out of the state" (*Id.* at ¶ 16); that she sent the letter solely out of "political hatred" and "the intent of creating community vitriol and spite" towards plaintiffs (*Id.* at ¶ 39); and that plaintiffs' political and religious viewpoints, coupled with their race and color, were "the motivating factors" for the letter (*Id.* at ¶ 50). Plaintiffs allege no facts to support these conclusory allegations.

**D. Plaintiffs' Conclusory Allegations About the Consequences of the Letter**

Plaintiffs claim that the Attorney General's letter "was reported on multiple media outlets" and "spread throughout the community of Rochester and the State of New York." *Id.* at ¶ 43. Although the complaint appears to suggest that the Attorney General published the letter (*id.* at ¶ 72), it does not allege how or when she did so. Indeed, a media report establishes that plaintiff Clark himself posted the letter online. ECF No. 13-3.

Plaintiffs allege further that the media reporting on the letter resulted in cancelled ticket sales (Compl. ¶ 43); that Pastor Paul and Cornerstone Church "now have a smear against their names which has created a suspicious taint on the relationships they have worked diligently to develop" (*id.* at ¶ 14), including with communities of color (*id.* at ¶ 43); and that Plaintiffs had to hire additional security to ensure the safety of the event's participants in case anyone acted out against them as a result of the Attorney General's allegedly "careless statements" (*id.* at ¶ 40).

Plaintiffs acknowledge that the event ultimately "went off without a single issue." *Id.* at ¶ 16. Plaintiffs do not allege that the Attorney General's letter caused them or anyone else to curtail their expressive activity, or that the Attorney General took any legal action against them.

## PROCEDURAL BACKGROUND

Plaintiffs brought this action against Attorney General James in January 2023. Their complaint alleges that the Attorney General's letter (1) violated plaintiffs' right to free speech under the First Amendment, enforced under 42 U.S.C. § 1983; and (2) constituted defamation and defamation by implication under New York law. Plaintiffs further alleged that the letter (3) violated New York Civil Rights Law § 40-c; (4) constituted negligence; and (5) violated their right to associate under the First Amendment. For relief, Plaintiffs seek an order requiring the

Attorney General to "fully and publicly retract her letter," as well as nominal and punitive (but not actual) damages.

The Attorney General moved to dismiss the complaint, arguing, among other things, that Plaintiffs lacked standing, that the complaint failed to state a cause of action, and that the Attorney General was shielded by qualified immunity with respect to the First Amendment claims and absolute or qualified privilege with respect to the defamation claims. ECF No. 13.

Magistrate Judge Schroeder issued a report and recommendation recommending that the state-law discrimination and negligence claims, as well as the freedom-of-association claim, be dismissed. ECF No. 20, 41 n. 10, 79 n. 5. He further recommended that the court deny the motion to dismiss the First Amendment freedom of speech and state-law defamation claims. ECF No. 20. The Attorney General objected to the report and recommendation. ECF No. 23. Judge Sinatra adopted the recommendation. ECF No. 25.

The Attorney General appealed to the Second Circuit. On appeal, the Attorney General argued that the district court erred in (1) declining to dismiss Plaintiffs' First Amendment claim based on qualified immunity; and (2) declining to dismiss Plaintiffs' state-law defamation claim on absolute privilege. *Doyle v. James*, Case No. 24-1605, ECF No. 25.1.

The Second Circuit vacated and remanded the district court's order on the First Amendment claim. The Second Circuit explained that it was vacating and remanding because the district court did not have the benefit of two decisions addressing First Amendment and qualified immunity issues. *Doyle v. James*, Case No. 24-1605, ECF No. 35. Specifically, the district court did not have the benefit of the Supreme Court's decision in *Nat'l Rifle Assoc. of Amer. v. Vullo*, 602 U.S. 175 (2024) or the Second Circuit's decision, on remand from the Supreme Court, in *National Rifle Association of America v. Vullo* ("*Vullo II*"), 144 F.4th 376 (2d

Cir. 2025). The Second Circuit remanded with instructions to revisit the First Amendment claim with the benefit of these decisions.

The Second Circuit also vacated as to the state-law defamation claim. On remand, the Second Circuit instructed the district court to analyze the Attorney General's absolute privilege defense considering three New York Court of Appeals decisions.

On remand, the Attorney General filed a renewed motion to dismiss arguing that (1) Attorney General James is entitled to dismissal of Plaintiffs' First Amendment claim based on qualified immunity; and (2) Attorney General James is entitled to dismissal of Plaintiffs' state-law defamation claim based on absolute privilege.[1] ECF No. 40. Magistrate Judge Schroeder recommended that the motion be denied. Attorney General James now objects to that recommendation.

**ARGUMENT**

When reviewing a report and recommendation, a district court "'may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.'" *Tripathy v. Schneider*, 2024 WL 1107892 at *3 (W.D.N.Y. March 14, 2024) (quoting 28 U.S.C. § 636(b)(1)(C)). "When a specific objection is made to a portion of a magistrate judge's report-recommendation, the Court subjects that portion of the report-recommendation to a de novo review." *Garcia v. Astrue*, 10 F. Supp. 3d 282, 287 (N.D.N.Y. 2012) (citing Fed. R. Civ. P. 72(b)(2); 28 U.S.C. § 636(b)(1)(C)). "As to those portions of a report to which no 'specific written objection' is made, the Court may accept the findings contained therein, as long as the

[1] Because the district court previously rejected the Attorney General's standing and Fed. R. Civ. P. 12(b)(6) failure to state a claim argument and those arguments were not raised during the appeal to the Second Circuit, the Attorney General does not repeat those arguments here. The Attorney General, however, incorporates those arguments by reference into this motion to preserve them for any future appeal, see ECF No. 13.

factual and legal bases supporting the findings are not clearly erroneous." *Niles v. Wilshire Inv. Grp., LLC*, 859 F. Supp. 2d 308, 316 (E.D.N.Y. 2012) (citations omitted).

## POINT I

## ATTORNEY GENERAL JAMES HAS QUALIFIED IMMUNITY FROM PLAINTIFFS' FIRST AMENDMENT CLAIM

The Magistrate Judge erred in recommending that Attorney General James is not entitled to qualified immunity. R&R, 13-31. Qualified immunity will defeat a section 1983 claim on a motion to dismiss unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right (2) that right was clearly established at the time of the challenged conduct. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).

### A. Plaintiffs Did Not Plausibly Allege That Attorney General James Violated Their First Amendment rights.

Plaintiffs' First Amendment claim is based exclusively on the letter that Attorney General James sent to the Tour's organizers expressing concerns about the potential for racially motivated violence and other unlawful conduct at the Tour's upcoming event. While it is unclear whether Plaintiffs assert a First Amendment claim for censorship as well as retaliation (*see* ECF No. 16, 8-12), the Attorney General's letter does not plausibly give rise to either claim.

#### 1. Plaintiffs did not plausibly allege an impermissible coercion claim.

The Magistrate Judge correctly found that to state a claim that the government violated the First Amendment through coercion, a plaintiff must plausibly allege conduct that "viewed in context, could be reasonably understood to convey a threat of adverse government action in order to punish or suppress the plaintiff's speech." *Vullo*, 602 U.S. at 191. The Magistrate Judge, however, erred in concluding that the Attorney General's letter conveyed such a threat.

The Magistrate Judge erred in holding that "defendant's assertion that her letter can only be construed to convey a request to avoid or prevent unlawful conduct is unavailing at the pleading stage." R&R, 17. The Magistrate Judge reached that conclusion by analogizing to *Vullo*. *Id.* In *Vullo*, however, there was no written letter that was part of the record. Instead, the Supreme Court relied, as it had to on a motion to dismiss, on the plaintiff's allegation that a government official verbally told insurance executives to sever ties with gun-advocacy groups, or face enforcement actions for unrelated insurance-law infractions. 602 U.S. at 191-93. Unlike this statement, there is no discernable request (let alone threat) to suppress disfavored speech in the Attorney General's letter. This distinguishes the letter from government speech found coercive in other cases, including the Supreme Court's decision in *Vullo*.

The government officials in those cases, unlike here, did not just invoke their regulatory authority and the specter of adverse consequences; they did so in connection with an unequivocal request to suppress disfavored expression. In *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963), a state commission told a book distributor to remove certain objectionable publications from circulation, or else the distributor would face referral for prosecution under the state's obscenity laws. In *Zieper v. Metzinger*, 474 F.3d 60 (2d Cir. 2007), an FBI agent told the author of a controversial film to remove the film from the internet, or else the FBI would continue looking into the matter. And in *Okwedy v. Molinari*, 333 F.3d 339 (2d Cir. 2003), a borough president told a religious group that their billboards were "not welcome in our Borough," and insinuated that a refusal to remove the billboards could prompt adverse action by the president's legal counsel and anti-bias task force.

In each of these cases, the government overtly demanded the suppression of speech and backed that demand with a threat of sanctions. Here, in contrast, Attorney General James never

demanded, explicitly or implicitly, that Plaintiffs suppress their or anyone else's speech; nor did she threaten adverse action if they refused to do so. Her only request was that Plaintiffs take steps to ensure that their planned event remained peaceful and complied with New York's antidiscrimination laws.

To be sure, the Attorney General's request to avoid violent and discriminatory conduct was based on her judgment that such conduct was rendered more likely by the white-nationalist rhetoric anticipated at the event—rhetoric that had contributed to several recent episodes of racially motivated violence. Compl., Ex. A. But the Constitution does not preclude a law enforcement official from forming or acting on such a judgment. While the First Amendment prohibits government officials from using state power to "punish or suppress disfavored expression," *Vullo*, 602 U.S. at 176, it does not prohibit them from addressing unlawful conduct associated with or caused by that expression.

In sum, nothing about the Attorney General's letter—including its words and tone, its invocation of regulatory authority and adverse consequences, or Plaintiffs' reaction—can reasonably be viewed as a threat to stifle speech.

**2. Plaintiffs did not plausibly allege a retaliation claim.**

When, as here, the adverse action underlying a First Amendment claim takes the form of a government official's speech, both retaliation and censorship claims require a showing that the speech, "viewed in context, could be reasonably understood to convey a threat of adverse government action in order to punish or suppress the plaintiff's speech." *Vullo*, 602 U.S. at 191 (setting out this standard in addressing both retaliation and censorship claim, after noting that the Second Circuit had analyzed both claims together); *Hammerhead Enterprises, Inv. v. Brezenoff*, 707 F.2d 33, 39 (2d Cir. 1983) (applying same standard to censorship claim); *X-Men Sec., Inc. v.*

*Pataki*, 196 F.3d 56, 70-72 (2d Cir. 1999) (applying same standard to retaliation claim); *Suarez Corp. Indus. V. McGraw*, 202 F.3d 676, 687-88 (4th Cir. 2000) (same, collecting cases). Because, as discussed above, the Attorney General's letter cannot reasonably be construed to convey a coercive threat to stifle speech, Plaintiffs' First Amendment retaliation claim fails as a matter of law. Accordingly, there is no need to independently analyze whether the government spoke with a retaliatory motive or caused Plaintiffs' injury. As *Vullo* holds, absent coercion "a government official can share her views freely and criticize particular beliefs." *Vullo*, 602 U.S. at 176.

Should the Court nonetheless conclude that Plaintiffs' retaliation claim requires an analysis of the elements required to establish a nonspeech-based retaliation claim, Plaintiffs' claim fails under that analysis as well. Specifically, Plaintiffs do not plausibly allege that (1) the Attorney General's letter was motivated or substantially caused by plaintiffs' exercise of their First Amendment rights or (2) the letter chilled their speech or caused them some other concrete harm. *See Dorsett v. County of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013) (setting out elements of First Amendment retaliation claim); *see also Vullo II*, 144 F.4th at 387.

The Magistrate Judge erred in concluding that Plaintiffs adequately alleged a retaliatory motive. The complaint offers nothing more than unsupported legal conclusions: that the Attorney General was motivated by "political hatred" (Compl., ¶ 39), a desire to rid the state of her political rivals (Compl., ¶ 16), and animus toward Plaintiffs' political and religious views (Compl., ¶ 50). Plaintiffs do not allege any facts to support these conclusory assertions; consequently, they fail to raise a plausible inference of retaliatory intent. *See Iqbal*, 556 U.S. at 678, 686-87; *Whiteside v. Hover-Davis, Inc.*, 995 F.3d 315, 321 (2d Cir. 2021). Nor can such an

inference be drawn from the letter itself. The only intent reflected in the letter is to deter violent and discriminatory conduct, not to punish Plaintiffs for their speech.

Equally conclusory are Plaintiffs' allegations concerning the injury the Attorney General allegedly caused them. Plaintiffs do not allege that her letter chilled their speech in any way. Nor do they allege facts plausibly suggesting that she caused them "some other concrete harm." *Dorsett*, 732 F.3d at 160 (2d Cir. 2013). While the complaint contains vague allegations about reputational harm and cancelled ticket sales (Compl., ¶¶ 43, 45), Plaintiffs allege no facts linking those harms to the allegedly defamatory content of the Attorney General's letter. On the contrary, the complaint acknowledges that, before the Attorney General was even involved, there was a "massive backlash" against the Tour's planned event and that other community leaders, politicians, and media outlets had made slanderous or false statements about the event. *Id.* at ¶¶ 18-19. The complaint offers no reason to conclude that the reputational or other harms they allegedly suffered were caused by the Attorney General's letter rather than this broader public backlash.

**B. In Any Event, Attorney General James' Letter Did Not Violate Clearly Established Law**

Even if Plaintiffs plausibly alleged a violation of their First Amendment rights, Attorney General James would be entitled to qualified immunity because the scope of those rights was not clearly established.

The precedents of the Supreme Court and the Second Circuit determine whether a constitutional right is "clearly established." *Gonzalez v. City of Schenectady,* 728 F.3d 149, 161 (2d Cir. 2013). An official's conduct does not violate clearly established law unless relevant precedents in existence at the time of the conduct had placed the constitutional question "beyond debate." *Stanton v. Sims*, 571 U.S. 3 (2013) (quotation marks omitted). In other words,

government officials "are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Collick v. Hughes*, 699 F.3d 211, 221 (2d Cir. 2012) (quotation marks omitted).

The Supreme Court has repeatedly stressed that clearly established law must be "defined with specificity." *Jones v. Treubig*, 963 F.3d 214, 224 (2d Cir. 2020). The inquiry does not turn on any "broad general proposition" but rather on "the specific context of the case." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) (quotation marks omitted). Rights are not clearly established, therefore, unless the Court can identify a case where an official acting under similar circumstances was held to have acted unconstitutionally. *Grice v. McVeigh,* 873 F.3d 162, 166 (2d Cir. 2017).

The Magistrate Judge erred in concluding that Attorney General James was not entitled to qualified immunity. First, the Magistrate Judge, relying on *Vullo*, concluded that the qualified immunity defense rested on Attorney General James "alternative explanation" of her speech as raising concerns about potential unlawful conduct at the ReAwaken America event. R&R, 25. Unlike in *Vullo*, however, this is not an "alternative explanation" of the intent and meaning of the Attorney General's letter. The intent and meaning of the letter is clear from its face, and the Magistrate Judge erred in crediting the conclusory allegations made by Plaintiffs about the meaning of the letter over the letter's clearly stated meaning and intent.

Second, while the Magistrate Judge correctly noted that "it has long been clearly established that 'implied threats to employ coercive state power to stifle protected speech' violate the First Amendment" (R&R, 25), there was no implied threat in the Attorney General's letter. Attorney General James did not demand, directly or indirectly, that Plaintiffs cancel their event or refrain from any expressive activity—much less did she threaten adverse consequences

if they refused. Instead, she merely asked them to take steps to ensure that the event remained peaceful and complied with New York's antidiscrimination laws. State Attorneys General routinely issue similar warnings to follow the law to many different individuals, organizations, and businesses;[2] indeed, using the bully pulpit in this manner to promote compliance with the law is a critical part of the Attorney General's role. *See, e.g.*, Lainie Rutkow & Stephen P. Teret, *The Potential for State Attorneys General to Promote the Public's Health: Theory, Evidence, and Practice,* 30 St. Louis U. Pub. L. Rev. 267, 276-77 (2011). A reasonable official in the Attorney General's shoes would have no reason to think that issuing such a warning could be deemed an unconstitutional attempt to stifle protected speech.

All of the cases in which either the Second Circuit or the Supreme Court considered whether government speech constituted impermissible coercion involved a government official unequivocally requesting that a private party suppress some form of protected expression. The question presented in those cases was whether the officials supported their request with arguments (i.e., persuasion) or threats of adverse government action (i.e., coercion). Some cases found persuasion, *Hammerhead Enters.*, 707 F.2d at 38-40; *VDARE Found. v. City of Colorado Springs*, 11 F.4th 1151, 1161-1163 (10th Cir. 2021); others found coercion, *Bantam Books*, 372 U.S. at 66-72; *Zieper*, 474 F.3d at 65-71; *Okwedy*, 333 F.3d at 342-44; *Rattner v. Netburn*, 930 F.2d 204, 208-10 (2d Cir. 1991); *accord Vullo*, 602 U.S. at 191-93. These cases have no application here as Attorney General James did not demand that Plaintiffs refrain from any expressive activity.

---

[2] To cite a few examples, the New York Attorney General has, across administrations, sent letters raising concerns about an event venue's use of facial-recognition software, *see* Ltr. From A.G. James to Madison Square Garden Entertainment Corp. (Jan. 24, 2023); instructing businesses not to price-gouge during a snow emergency, *see* A.G. Schneiderman Cracks Down On Price Gouging During Buffalo Blizzard (Nov. 24, 2014); and ordering mortgage-rescue companies to cease fraudulent practices against homeowners, *see* A.G. Cuomo Orders Mortgage Rescue Companies To Cease Fraudulent Practices (Jun. 23, 2010). (For authorities available online, full URLs appear in the Table of Authorities. All URLs were last visited on October 6, 2026.)

The dearth of caselaw addressing the "specific context" of this case confirms the reasonableness of the Attorney General's warning here. *Mullenix*, 577 U.S. at 12. When there is a public gathering on a highly controversial and divisive issue—as there undisputedly was here—the law is far from clear that the First Amendment prohibits law enforcement officials from urging organizers and attendees to avoid violent confrontation and respect the rights of others. Such admonitions do not suppress speech but protect it, by ensuring that all sides of the debate can speak freely, without fear of violence or intimidation. Attorneys General of all political stripes have issued similar messages to safeguard the public square during times of heightened tension. *See, e.g.*, WALL STREET JOURNAL, Attorney General Urges Calm (Nov. 21, 2014) (U.S. Attorney General Eric Holder urging protesters to be peaceful ahead of grand-jury decision in divisive case); U.S. Dep't of Justice, Attorney General William P. Barr's Statement on Riots and Domestic Terrorism (May 31, 2020) (U.S. Attorney General William Barr calling for deployment of law enforcement to ensure that "peaceful and legitimate protests" are not "hijacked by violent radical elements"); WANE.COM, Ohio Attorney General Warns Student Protesters in Masks Could Face Felony Charges Under Anti-KKK Law (May 9, 2024) (Ohio Attorney General warning students who wear masks during pro-Palestinian protests that they could be prosecuted under the state's anti-KKK law). Even if this widespread practice did raise First Amendment concerns, no case—much less a Second Circuit or Supreme Court case—clearly establishes the parameters of permissible Attorney General communications in this context. Given the absence of settled law, Attorney General James is entitled to qualified immunity for taking reasonable steps to encourage "a peaceful and law-abiding event." Compl., Ex. A.

## **POINT II**

**ATTORNEY GENERAL JAMES HAS ABSOLUTE PRIVILEGE FROM PLAINTIFFS' DEFAMATION CLAIM**

Contrary to the Magistrate Judge's finding, Attorney General James did not need to initiate a formal investigation, prosecution, or other similar process against Plaintiffs to speak within the scope of her official duties. Like all government officials in New York, the Attorney General's authority includes not only those powers expressly conferred by statute—like conducting investigations and initiating court proceedings to enforce antidiscrimination laws, *see* N.Y. Civil Rights Law §§ 79-n(3), 40-d; N.Y. Exec. Law § 63(12)—but any powers required by necessary implication, *Stevens v. New York State Div. of Crim. Just. Servs.*, 40 N.Y.3d 505, 524 (2023). And the power to enforce New York's antidiscrimination laws necessarily implies the power to identify situations in which those laws might be violated and to instruct relevant individuals to comply with those laws. *See Gautsche*, 67 A.D.2d at 170 (Attorney General's power to conduct fraud investigations includes power to inform public about facts underlying fraud investigations).

Many cases confirm that public officials need not initiate a formal governmental process to speak within the scope of their duties. For example, New York courts have found the absolute privilege applicable to the following officials who had initiated no such process:

- a college president who issued a statement responding to publicly reported allegations of anti-Catholic bias at the college, *Lombard v. Stoke*, 18 N.Y.2d 394 (1966);

- a city borough president who allowed the press to review a report he had prepared characterizing the plaintiff appraiser as ignorant and incompetent, *Sheridan*, 14 N.Y.2d 108;

- a school superintendent who circulated a letter to the local community implicitly accusing the plaintiff football coach of not following proper Covid-19 precautions, *Sindoni v. Bd. of Educ. of Skaneateles Cent. Sch. Dist.*, 217 A.D.3d 1363 (4th Dep't 2023);

- school officials who disclosed that a community member had purchased a firearm for his son, which the officials believed to pose a safety issue for the school,

*Jeffery v. Fayetteville-Manlius Cent. Sch. Dist.*, 222 A.D.3d 1366 (4th Dep't 2023); and

- a county health commissioner who commented publicly on an official's handling of a tuberculosis incident that had become a matter of public controversy, *Schell v. Dowling*, 240 A.D.2d 721 (2d Dep't 1997).

In none of these cases did the availability of the absolute privilege turn on the defendant officials' initiation of a formal governmental process or on an express statutory duty to issue the challenged statements. Rather, the statements were deemed to fall within the officials' duties because, like the statements in Attorney General James's letter, they were "made in the course of the performance of some function connected with the office" they occupied. *Sheridan*, 14 N.Y.2d at 113. The Magistrate Judge dismissed these cases because the public officials were not "law enforcement officials" (R&R, 35), but the Magistrate Judge provides no explanation for why law enforcement officers should be held to a different standard than other public officials speaking outside formal government processes.

The Magistrate Judge cites *Firth v. State of New York*, 785 N.Y.S.2d 755 (3d Dep't 2004) and *Brantley v. Mun. Credit Union*, 10 Civ. 10994, 2021 WL 981334, at *10 (S.D.N.Y. Mar. 16, 2021) to support the conclusion that "the absolute privilege for government speech is triggered only after the official has initiated some action in the enforcement of his governmental authority." R&R, 35. The Magistrate Judge, however, draws the causal inference in the wrong direction: that a court concluded that statements made ***during*** an investigation or governmental process are protected by absolute privilege does not necessarily mean that statements made ***before*** an investigation are not protected.

In remanding the case, the Second Circuit instructed the district court to consider three New York Court of Appeals decisions when reconsidering Plaintiffs' state law defamation claim: *Gottwald v. Sebert*, 40 N.Y.3d 240 (2023), *Wiener v. Weintraub*, 22 N.Y.2d 330 (1968), and

*Rosenberg v. MetLife, Inc.*, 8 N.Y.3d 359 (2007). All three cases support dismissal and the Magistrate Judge's attempts to distinguish the cases should be rejected.

In *Weiner*, the New York Court of Appeals held that a complaint letter accusing an attorney of misconduct that had been sent to the grievance committee of a bar association was absolutely privileged. The Court observed that the grievance committee functions as a quasi-judicial body through its investigation of complaints and administration of disciplinary proceedings. Although the complaint letter was sent ***before*** the grievance committee opened any investigation, the complaint letter was still protected by the absolute privilege. The Court emphasized that strong policy reasons supported the application of an absolute privilege to such complaints.

The Magistrate Judge attempts to distinguish *Weiner* by noting that "of course, defendant's allegedly defamatory statement were not made during the course of any judicial proceeding." R&R, 38. But neither were the statements in *Weiner*. Those statements were made in the complaint letter ***before*** the grievance committee initiated any judicial process.

Similarly, in *Rosenberg*, the New York Court of Appeals held that statements made by an employer on a National Association of Securities Dealers' employee termination notice were subject to an absolute privilege. Plaintiff argued that the employee termination notice was "too remote from the NASD's quasi-judicial functions to warrant the application of an absolute privilege." *Rosenberg*, 8 N.Y.3d at 364. The Court rejected that argument, explaining that "the absolute privilege can extend to preliminary or investigative stages of the process, particularly where compelling public interests are at stake." *Id.* at 365. The Court then explained that that the employee termination notice served a significant role in the NASD's self-regulatory process

because it "is designed to alert the NASD to potential misconduct and, in turn, enable the NASD to investigate, sanction and deter misconduct by its registered representatives. *Id.* at 367-68.

The Magistrate Judge dismissed *Rosenberg* as an analogy for the same reasons it dismissed *Weiner*: "because defendant's statements were not made as part of, or as a preliminary step in, any judicial or quasi-judicial process." R&R, 37. The statements on an employee termination notice, however, are also not part of any judicial or quasi-judicial process. As the Court of Appeals explained the statements were "designed to alert the NASD to potential misconduct and, in turn, enable the NASD to investigate, sanction and deter misconduct by its registered representatives." *Rosenberg*, 8 N.Y.3d at 367-68.

For all these reasons, the Court should find that the statements in Attorney General James's letter fall within the scope of absolute privilege and dismiss Plaintiffs' state law defamation claim.

## CONCLUSION

For the foregoing reasons, the Court should reject the portions of the Report and Recommendation recommending the denial of Defendant's motion to dismiss and, instead, grant Defendant's motion to dismiss.

DATED: Buffalo, New York
October 6, 2026

LETITIA JAMES
Attorney General of the State of New York
Attorney for Defendant

BY: */s/ Daniel R. Maguire*

DANIEL R. MAGUIRE
STEPHANIE J. CALHOUN
Assistant Attorney General, of Counsel
350 Main Street
Main Place Tower, Suite 300A
Buffalo, New York 14202
(716) 853-8419
daniel.maguire@ag.ny.gov