**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

---

PASTOR PAUL DOYLE and CLAY CLARK,

Plaintiffs,

Case No. 23-cv-00071-JLS-HKS

v.

ATTORNEY GENERAL LETITIA JAMES,
in her individual and official capacity,

Defendant.

---

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S OBJECTIONS TO THE REPORT, RECOMMENDATION & ORDER**

## PRELIMINARY STATEMENT

Defendant Attorney General Letitia James ("the Attorney General") asks this Court to reject a careful, forty-page Report, Recommendation and Order ("R&R") that did exactly what the Second Circuit directed on remand: it reconsidered Plaintiffs' First Amendment claim in light of *National Rifle Association of America v. Vullo*, 602 U.S. 175 (2024), and *National Rifle Association of America v. Vullo* ("*Vullo II*"), 144 F.4th 376 (2d Cir. 2025), and it analyzed the defamation claim under the New York authorities the Second Circuit identified. (R&R at 8.) Having done so, Magistrate Judge Schroeder correctly recommended that the Attorney General's partial motion to dismiss be denied in all respects. (R&R at 38.)

The Objections raise nothing the Magistrate Judge did not already consider and reject. They re-argue — often verbatim — the positions advanced in the Attorney General's motion and reply: that her August 3, 2022 letter conveyed no threat, that Plaintiffs pleaded no retaliatory motive or injury, that she is shielded by qualified immunity, and that her defamatory statements

are absolutely privileged. Each argument depends on a single move the law forbids at the pleading stage: crediting the Attorney General's own benign characterization of her letter over Plaintiffs' well-pleaded allegations about how a reasonable recipient understood it. The Supreme Court squarely rejected that move in *Vullo*, 602 U.S. at 195.

The letter at issue here is, if anything, a stronger case for Plaintiffs than *Vullo* was for the NRA. There, the coercion was aimed at third-party regulated entities engaged in non-expressive activity — a theory the Second Circuit found so attenuated that it granted qualified immunity. *Vullo II*, 144 F.4th at 391-92. Here, New York's top law enforcement officer sent a letter directly to the organizers of an expressive event, on official letterhead, tying them to white-nationalist violence and warning that she "stand[s] ready to investigate" and "enforce" the law "to the fullest extent available." (R&R at 5.) That is precisely the direct targeting of a speaker that the *Bantam Books*-to-*Okwedy* line of cases clearly established as unlawful long before 2022. The Court should overrule the Objections, adopt the Report and Recommendation in full, and deny the motion to dismiss.

## <u>STANDARD OF REVIEW</u>

A district judge "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made," and "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). Rule 72(b)(3) is to the same effect: the court "must determine de novo any part of the magistrate judge's disposition that has been properly objected to." Fed. R. Civ. P. 72(b)(3).

Two limits on that review bear on the Objections. First, an objection "generally may not raise new arguments not previously made before the magistrate judge." *Nambiar v. Cent.*

*Orthopedic Grp., LLP*, 158 F.4th 349, 359 (2d Cir. 2025). Even on de novo review, a district court "ordinarily will not consider arguments, case law and/or evidentiary material which could have been, but [were] not, presented to the magistrate judge in the first instance." *J.P.T. Auto., Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 659 F. Supp. 2d 350, 353 (E.D.N.Y. 2009). To the extent the Attorney General now presses arguments she did not raise in her motion, they are not properly before the Court. Second, de novo review does not mean the Magistrate Judge's analysis is entitled to no weight; it means the Court reviews the same arguments the Attorney General already made and the Magistrate Judge already rejected. *Nambiar*, 158 F.4th at 361. As shown below, that analysis was correct.

The governing pleading standard is well-settled. On a Rule 12(b)(6) motion the Court must "accept all factual allegations in the complaint as true and draw all reasonable inferences in [the plaintiff's] favor," asking only whether the complaint "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Willey v. Kirkpatrick*, 664 F. Supp. 2d 218, 221-22 (W.D.N.Y. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). That obligation is heightened where, as here, the defendant asserts qualified immunity: the defendant "must accept that the plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also that defeat the immunity defense." (R&R at 23.)

## ARGUMENT

### POINT I: THE MAGISTRATE JUDGE CORRECTLY FOUND THAT PLAINTIFFS PLAUSIBLY ALLEGED A FIRST AMENDMENT VIOLATION

#### A. Plaintiffs Plausibly Alleged Impermissible Coercion

The Attorney General concedes the governing standard: to state a First Amendment coercion claim, "a plaintiff must plausibly allege conduct that, viewed in context, could be

reasonably understood to convey a threat of adverse government action in order to punish or suppress the plaintiff's speech." *Vullo*, 602 U.S. at 191. She argues only that her letter does not meet it. (Def.'s Obj. at 11.) The Magistrate Judge correctly held otherwise, and he did so by applying the very factors the Supreme Court identified in *Vullo*.

"The power that a government official wields, while certainly not dispositive, is relevant to the objective inquiry of whether a reasonable person would perceive the official's communication as coercive." (R&R at 14 (quoting *Vullo*, 602 U.S. at 191).) The Attorney General opened her letter by identifying herself as "New York's top law enforcement officer," and she wrote on the official letterhead of the Office of the Attorney General, bearing its insignia. (R&R at 15.) As in *Vullo*, that authority weighs heavily toward a reasonable perception of coercion. *Vullo*, 602 U.S. at 191-94.

After linking Plaintiffs and the event's speakers to "white nationalist ideals," the "Great Replacement Theory," and the racially motivated mass shooting in Buffalo, the Attorney General enumerated the civil-rights statutes Plaintiffs might violate and their penalties, then declared that her office "stand[s] ready to investigate any violation of the laws above and, if necessary, to enforce them to the fullest extent available," and "instructed" the organizers "to take all necessary steps to ensure that the event complies fully" with the law. (R&R at 5.) The Magistrate Judge accurately characterized this as a "heavy-handed, ominous" communication whose sequence and tone could reasonably cause its recipients to perceive "the specter of prosecution" should they proceed with the event. (R&R at 16.) The letter, moreover, located the danger it warned against in Plaintiffs' own speech. It cited "extremist statements made by yourselves and the other featured speakers on the tour" and the speakers' "allusions to white nationalist ideals," and it warned that "such rhetoric could contribute to violent or unlawful conduct." (R&R at 3–4.)

Read in that light, the instruction "to take all necessary steps" to ensure the event complied with the law is reasonably understood as a demand that Plaintiffs curb that speech or cancel the event, not a neutral reminder to obey the civil-rights laws.

The Attorney General's central objection — that her letter contains no express "request (let alone threat) to suppress disfavored speech" (Def.'s Obj. at 12) — fails as a matter of law. The Supreme Court held in *Vullo* that a coercive "threat need not be explicit"; an implicit threat or inducement is equally actionable. *Vull*o, 602 U.S. at 193. A letter that recites a private party's supposed links to violence, lists the penalties for violating enumerated statutes, and announces the official's readiness to "enforce them to the fullest extent available" can be "reasonably understood as a threat or as an inducement." *Id*.

The Attorney General's effort to distinguish *Vullo* on the ground that "there was no written letter that was part of the record" there (Def.'s Obj. at 12) cuts against her. *Vullo* itself arose from guidance letters, a press release, and meeting allegations, and the Court applied the same contextual standard to all of them. *Vullo*, 602 U.S. at 191. That a written letter exists here makes Plaintiffs' claim *more* concrete, not less. In all events, the Attorney General's argument asks this Court to adopt her reading of her own letter — that it "can only be construed to convey a request to avoid or prevent unlawful conduct." (R&R at 17.) *Vullo* forecloses that approach. A court "cannot simply credit" the official's asserted "obvious alternative explanation" to defeat the plausibility of a coercive threat; at the pleading stage it "must assume the well-pleaded factual allegations in the complaint are true." *Vullo*, 602 U.S. at 195. The Second Circuit applied the same rule in *Okwedy v. Molinari*, 333 F.3d 339 (2d Cir. 2003), vacating a district court dismissal that had read a borough president's letter as non-threatening rather than "view[ing] the language of [the] letter in the light most favorable to plaintiffs." *Id*. at 344.

Finally, that the event ultimately proceeded "without a single issue" (R&R at 6) does not defeat the claim. A "public-official defendant who threatens to employ coercive state power to stifle protected speech violates a plaintiff's First Amendment rights," *Okwedy*, 333 F.3d at 344, regardless of whether the attempt succeeds. (R&R at 17.)

**B. Plaintiffs Plausibly Alleged Retaliation**

The Attorney General does not dispute that Plaintiffs engaged in protected activity. (R&R at 19.) She contends that the retaliation claim fails absent a coercive threat, and otherwise contests only motive and injury. (Def.'s Obj. at 13–14.) The Magistrate Judge correctly rejected each contention.

The threshold contention that, absent coercion, the retaliation claim necessarily fails (Def.'s Obj. at 14) misreads the governing law. *Vullo II* expressly differentiates coercion and retaliation claims "because the two rest on temporally distinct factual allegations": coercion "involves an attempt to induce or prevent conduct before the fact," while retaliation "involves punishment for conduct after the fact." *Vullo II*, 144 F.4th at 384–85; *see* R&R at 12. The court accordingly "evaluate[s] the two theories separately." *Vullo II*, 144 F.4th at 385. In any event, because the letter plausibly conveys a threat of adverse government action (Point I.A, *supra*), the retaliation claim survives even under the standard the Attorney General proposes.

Because "a defendant's motive and intent are difficult to plead with specificity," it is enough to "allege facts from which a retaliatory intent reasonably may be inferred" — "a low bar." (R&R at 19.) Plaintiffs allege that the Attorney General sent her letter because she viewed the Tour as filled with "political rivals" she "wanted . . . out of the state," and that Plaintiffs' political and religious viewpoints were the "motivating factors" for the letter. (R&R at 19.) Those allegations are reinforced by temporal proximity: the letter followed close on the public opposition to the Rochester event and its relocation to Cornerstone Church, and the letter itself

reflects the Attorney General's awareness of Plaintiffs' conservative viewpoint. (R&R at 20.) The Attorney General's contention that these allegations are "conclusory" (Def.'s Obj. at 14) simply reasserts her own view of the facts; it does not engage the standard, which asks only whether a retaliatory intent "reasonably may be inferred" from the pleaded facts. (R&R at 19.)

"Chilled speech is not the *sine qua non* of a First Amendment claim"; "[v]arious non-speech related harms are sufficient." *Dorsett v. County of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013); *see* R&R at 21. Plaintiffs allege that the letter falsely associated them with racist violence, injuring their reputations and Pastor Doyle's relationships with communities of color, causing ticket cancellations, and forcing them to hire additional security. (R&R at 21.) Those allegations suffice. (R&R at 22.) The Attorney General's argument that the pre-existing "backlash" against the event, not her letter, caused Plaintiffs' harm (Def.'s Obj. at 15) raises a question of fact that cannot be resolved on the pleadings; it is a matter for discovery, not dismissal.

The Attorney General's suggestion that Mr. Clark himself posted the letter online (Def.'s Obj. at 7 (citing ECF No. 13-3)) is likewise improper on a Rule 12(b)(6) motion. The media report on which she relies is outside the pleadings and cannot be used to contradict the Complaint's allegation that the Attorney General "knowingly published multiple false statements to multiple media outlets." (R&R at 22 n.6 (quoting Dkt. #1 at 2).) And regardless of who later reposted the letter, the reputational injury flows from the content the Attorney General authored and placed on her office's official letterhead.

## <u>POINT II</u>: QUALIFIED IMMUNITY IS UNAVAILABLE AT THE PLEADING STAGE

Qualified immunity does not rescue the motion. At the Rule 12(b)(6) stage the defense "faces a formidable hurdle" and "is usually not successful because it is the defendant that must plead and prove the defense." (R&R at 23.) It may be resolved on the pleadings only where "the

facts supporting [it] appeared on the face of the complaint." *Vullo II*, 144 F.4th at 388 (quoting *McKenna v. Wright*, 386 F.3d 432, 435 (2d Cir. 2004)). The Second Circuit has stressed that courts "generally prefer" to resolve qualified immunity at summary judgment, "when the details of the alleged deprivations are more fully developed." *Id.* at 388 n.3.

The Attorney General cannot clear that hurdle for the same reason her merits argument fails: the facts she relies on do not appear on the face of the complaint. Her defense rests on her own characterization of the letter's "intent and meaning" as raising benign "concerns" about unlawful conduct. (R&R at 25.) But Plaintiffs plausibly allege that a reasonable recipient understood the letter as a coercive and retaliatory threat, and the Court "may not credit the defendant's alternative explanation of her speech over plaintiffs' well-pleaded factual allegations at the pleading stage." R&R at 25 (*citing Vullo,* 602 U.S. at 195).

The right at issue was clearly established in August 2022. For a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *Vullo II*, 144 F.4th at 389 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). That standard is satisfied here. Since *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963), the law has prohibited a government official's "threat of invoking legal sanctions and other means of coercion . . . to achieve the suppression" of disfavored speech. *Vullo*, 602 U.S. at 189 (quoting *Bantam Books*, 372 U.S. at 67). The Second Circuit applied that principle in *Okwedy*, holding that a public official who "threatens to employ coercive state power to stifle protected speech violates a plaintiff's First Amendment rights" even absent direct regulatory authority. *Okwedy*, 333 F.3d at 344.

The Attorney General's contention that no case addresses the "specific context" of her letter (Def.'s Obj. at 18) frames the right too narrowly. "[O]fficials can still be on notice that

their conduct violates established law even in novel factual circumstances," and "a court need not have passed on the identical course of conduct in order for its illegality to be clearly established." *Vullo II*, 144 F.4th at 390-94 (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002), and *Williams v. Greifinger*, 97 F.3d 699, 703 (2d Cir. 1996)). The Supreme Court has rejected precisely the tactic of defining a right so granularly that immunity attaches unless a prior case shares nearly identical facts. (R&R at 27.)

*Vullo II* confirms the point and, read correctly, is a roadmap to denying immunity here. The Second Circuit granted Vullo qualified immunity for one reason only: her coercion targeted "third-party regulated entities" engaged in "nonexpressive activity," making the effect on the NRA's speech "significantly more attenuated" than in the governing precedents. *Vullo II*, 144 F.4th at 391-92. The court expressly contrasted the *Bantam Books-Okwedy-Rattner* line, in which "the nexus between the defendant's coercive conduct and the eventual infringement of the plaintiff's First Amendment rights was clear" because the conduct targeted a speaker or a conduit for the speaker and "sought to stop the speech itself." *Id*. at 392. This case falls squarely within that clearly established line. The Attorney General did not pressure some attenuated third party; she wrote directly to the organizers of an expressive event to deter them from holding it. The direct-targeting distinction that earned Vullo immunity is absent here, and the Magistrate Judge correctly so held. (R&R at 29.)

## POINT III: ABSOLUTE PRIVILEGE DOES NOT SHIELD THE ATTORNEY GENERAL'S DEFAMATORY LETTER

The Attorney General's absolute-privilege defense fares no better. New York confines the executive absolute privilege to "a principal executive of State or local government" and only to "statements made during the discharge of those responsibilities about matters which come within the ambit of those duties." *Clark v. McGee*, 49 N.Y.2d 613, 617-18, 404 N.E.2d 1283,

1285 (1980). "[P]owerful countervailing considerations . . . preclude broad application or expansion of this privilege": "[p]ublic office does not carry with it a license to defame at will," and the privilege "is not to be extended liberally" but "must be carefully confined to that type of situation in which the protection provided by the privilege will serve a necessary societal function." *Id.* at 618, 404 N.E.2d at 1286.

Two factors govern — "[b]oth the subject of the statement and the circumstances in which it is made." *Id.* at 619, 404 N.E.2d at 1286-87. Even a statement that relates to an official's duties is not privileged unless it was "made during [the] performance of an essential part of his public duties." *Id.* at 620-21, 404 N.E.2d at 1287. And the privilege does not attach where "the subject of the communication is unrelated to any matters within his competence . . . or if the form of the communication — e.g., a public statement — is totally unwarranted." *Lombardo v. Stoke*, 18 N.Y.2d 394, 401, 222 N.E.2d 721, 724-25 (1966).

Applying those principles, the Magistrate Judge correctly found the letter unprivileged. The Attorney General had "initiated no investigation, prosecution, or any other governmental process against plaintiffs," and she does not contend that Plaintiffs "had engaged in any actual or suspected acts that would fall within the scope of her law-enforcement authority." (R&R at 33.) The letter was therefore "untethered to any official action or process involving plaintiffs," and the policy rationale for absolute immunity is not served by shielding it. (R&R at 36.)

The Attorney General's own authority proves the point. In *Gautsche v. State*, 67 A.D.2d 167, 415 N.Y.S.2d 280 (3d Dep't 1979), the Attorney General's statements were privileged precisely because they bore "some relation to the executive proceeding in which the official is acting" — an actual, commenced investigation and prosecution of charity fraud. *Id.* at 169-70, 415 N.Y.S.2d at 282; *see Cheatum v. Wehle*, 159 N.E.2d 166, 170 (N.Y. 1959) (articulating the

"some relation" standard); R&R at 30. No such proceeding existed here. The Attorney General's argument that she "need not initiate a formal . . . process" and that the enforcement power "necessarily implies the power to identify situations in which those laws might be violated" (Def.'s Obj. at 19) would extend the privilege far beyond the narrow bounds New York has drawn, shielding gratuitous accusations against private citizens who are not the subject of any legitimate scrutiny. New York law rejects that expansion. *Clark*, 49 N.Y.2d at 618, 404 N.E.2d at 1286.

The Attorney General further contends that the Magistrate Judge offered "no explanation" for distinguishing her authorities involving a college president, a borough president, school officials, and a county health commissioner. (Def.'s Obj. at 20.) The explanation lies in *Clark* itself. The privilege attaches only to statements "made during [the] performance of an essential part of his public duties." *Clark*, 49 N.Y.2d at 620-21, 404 N.E.2d at 1287. For officials whose role includes informing the public about matters within their own institutions, such statements are part of that essential function. For the State's chief law enforcement officer, the essential function is investigation and enforcement. An accusation directed at private citizens who are the subject of no investigation or proceeding is not part of that function, and its form is precisely what *Lombardo* deems "totally unwarranted." *Lombardo*, 18 N.Y.2d at 401, 222 N.E.2d at 724-25. That is the distinction the Magistrate Judge drew in observing that those officials "were not law enforcement officials." (R&R at 35.) Nor does *Stevens v. New York State Division of Criminal Justice Services*, 40 N.Y.3d 505 (2023), help the Attorney General (Def.'s Obj. at 19); it concerns an agency's power to promulgate regulations and "has no application to the facts of this case." (R&R at 34 n.9.)

Nor do the three decisions the Second Circuit flagged on remand aid the Attorney General. Each confines the absolute privilege to statements made in, or as a step within, an actual judicial or quasi-judicial proceeding. In *Gottwald v. Sebert*, 40 N.Y.3d 240, 220 N.E.3d 621 (2023), the protected statements were "made during the course of a judicial proceeding" and were "material and pertinent to the questions involved." *Id.* at 253-54, 220 N.E.3d at 629. In *Wiener v. Weintraub*, 22 N.Y.2d 330, 239 N.E.2d 540 (1968), the complaint letter was privileged only because a bar grievance committee "acts as a quasi-judicial body" and "the filing of the complaint . . . initiated a judicial proceeding." *Id.* at 331-32, 239 N.E.2d at 541. And in *Rosenberg v. MetLife, Inc.*, 8 N.Y.3d 359, 866 N.E.2d 439 (2007), the Form U-5 was privileged because it was a mandatory "preliminary or first step" in the NASD's existing quasi-judicial process. *Id.* at 365-68, 866 N.E.2d at 442-43. The Attorney General's reading of *Wiene*r and *Rosenberg* — that they protect pre-investigation statements generally (Def.'s Obj. at 21) — ignores their common premise: an actual judicial or quasi-judicial process to which the statement is a recognized first step. The Attorney General's letter initiated no such process. Moreover, in each of those cases the privileged statement was made to or within the tribunal itself, consistent with the privilege's purpose of encouraging the reporting of misconduct to a body empowered to adjudicate it. Here, the Attorney General sent her accusations directly to the people she accused, and no tribunal was involved. At most, her statements are protected by a qualified privilege, which Plaintiffs' allegations of malice defeat. *Clark*, 49 N.Y.2d at 621, 404 N.E.2d at 1287.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court overrule Defendant's Objections, adopt the Report, Recommendation and Order in its entirety, and deny Defendant's motion to dismiss.

Dated: October 21, 2026

Respectfully submitted,

*Tricia S. Lindsay*

TRICIA S. LINDSAY
*Attorney for Plaintiffs*
531 E. Lincoln Ave STE 5B
Mount Vernon, NY 10552
Ph. (347) 386-4604; (914) 668-4908
tricialindsaylaw@gmail.com